(64 South. 853.)

Nos. 20,080, 20,088.

BLOOMFIELD et al. v. THOMPSON, Commissioner of Public Utilities, et al.

In re BLOOMFIELD et al.

(Dec. 15, 1913. On Rehearing, April 13, 1914.)

*(Syllabus by the Court.)*

1. COURTS (§ 224*)—CERTIORARI (§ 5*)—JURISDICTION—REMEDY BY APPEAL.

From the time that this court was vested, by the Constitution of 1879, article 90, with the "control and general supervision of all inferior courts," it has, uniformly and repeatedly, held that the intent and purpose of that grant of jurisdiction was, and is, not to authorize it to exercise powers conferred upon, and properly exercised by, other courts, but, to provide an instrumentality for the correction of errors committed by such other courts whilst exercising the powers conferred upon them, in cases where no other remedy is provided, or where the remedy, as provided, proves inadequate; and, as it is the function of this court to interpret the law in the last resort in this state, save in cases in which its decisions may be reviewed by the Supreme Court of the United States, it follows that article 94 of the Constitution of 1898 must be taken to mean what it has been so held to mean, and hence that it cannot be successfully invoked to sustain the jurisdiction of this court to review, by means of the writ of certiorari, a judgment for the review of which the remedy by appeal to another court, as granted by the Constitution, is an adequate one.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 487, 608, 609, 614, 616, 617; Dec. Dig. § 224;* Certiorari, Cent. Dig. §§ 5, 6; Dec. Dig. § 5.*]

2. CERTIORARI (§§ 2, 60*)—JURISDICTION—MOTION TO DISMISS—TIME FOR MAKING.

It would be inconsistent with the Constitution of 1913, and hence not within the saving clause (continuing, pending writs, actions, etc.) for this court to proceed to decide a case which had been brought before it, by certiorari, prior to the adoption of the Constitution, in view of the provision contained in that instrument giving a right of appeal in such case and vesting jurisdiction of the appeal in another court; and a motion to dismiss the proceeding is not too late, though made while the case is pending on rehearing and by a litigant who had not applied for the rehearing.

[Ed. Note.—For other cases, see Certiorari, Cent. Dig. §§ 2, 153–167; Dec. Dig. §§ 2, 60.*]

3. CERTIORARI (§ 62*)—APPLICATION FOR REHEARING—EFFECT TO SUSPEND JUDGMENT.

An application for rehearing in a case which has been decided by the Supreme Court has the effect of preventing the judgment from becoming final, in whole or in part, whilst the court is deliberating thereon; and, even though the rehearing be granted in terms restricting it to particular issues, the whole case remains under the control of the court, since such restriction must be construed to mean, merely, that the court desires to hear further argument upon the issues that are specified, and not upon others.

[Ed. Note.—For other cases, see Certiorari, Cent. Dig. §§ 170–173; Dec. Dig. § 62.*]

*(Additional Syllabus by Editorial Staff.)*

4. WORDS AND PHRASES—"JURISDICTION."

"Jurisdiction" is the power to declare the law; and, when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 4, pp. 3876–3885; vol. 8, pp. 7697, 7698.]

Action by William B. Bloomfield and another against W. B. Thompson, Commissioner of Public Utilities, and another. Judgment for defendants, and plaintiffs apply for writ of certiorari. Certiorari proceeding dismissed without prejudice, on rehearing.

See, also, 133 La. 209, 62 South. 634.

Charles Rosen, of New Orleans (James D. Hill, of New Orleans, of counsel), for relators. I. D. Moore, City Atty., John F. C. Waldo and John J. Reilley, Asst. City Attys., all of New Orleans, for respondents.

PROVOSTY, J. The relators herein, William B. Bloomfield and the New Orleans Board of Trade, Limited, as holders of three of the $1,000 bonds of the Public Belt Railroad of the city of New Orleans, complain that the contract of said bonds will be impaired if a certain ordinance passed by the commission council of the city is carried into effect, and they ask for an injunction.

The defense is that the relators are without pecuniary interest, and therefore without standing, to litigate the matter, and that the said ordinance does not, as a matter of fact, have the said injurious effect. Incidentally it is urged that the decision of the trial court from which this court has heretofore declined

to entertain an appeal (Bloomfield v. Thompson, 133 La. 209, 62 South. 634), is not ·reviewable in the present form of proceeding. This last contention, though in logical order coming up first, we will. for brevity and convenience, consider last.

The series of bonds of which the three in question form part was issued under authority of Act No. 179, p. 256, of 1908, subsequently adopted. as an amendment to the Constitution. The series is of $300,000, but ·the act authorizes the issuance of an amount not to .exceed $2,000,000. The bonds are required to be issued by the city of New Orleans, and to be "styled Public Belt Railroad Bonds of the city of New Orleans," and to be payable, as follows:

"The principal and interest of said bonds shall be paid by preference from the revenues of the Public Belt Railroad of the city of New Orleans, after deducting the expenses of maintenance and operation, and all future Public Belt Railroad revenues, after deducting the expenses of maintenance of operation, are hereby pledged to secure said bonds and interest."

In case these revenues prove insufficient to pay this interest, the act requires payment to be made in bonds having the same term to run as the bonds representing the principal, but payable sooner at the option of the city, and requires a special tax to be levied on all the property of the city on and after January, 1963, for their payment. And requires a like tax to be levied to pay the ·principal of the bonds, in case of nonpayment out of the revenues of the Belt Railroad.

The act provides that its provisions shall constitute a contract between the holder of the bonds and the city of New Orleans.

It requires the proceeds of the bonds to be expended in the construction and equipment of the Belt Railroad. Its section 7 provides as follows:·

"Sec. 7. Be it further enacted, etc., that the city of New Orleans shall construct, equip, maintain and operate said Public Belt Railroad System of the city of New Orleans through and by means of such board or commission, as may have been or may be organized by the city of New Orleans, the members of which shall be appointed by the mayor of the city of New Orleans, with the consent of the council, the powers, duties and functions of which shall be prescribed by the city of New Orleans. The city of New, Orleans shall always have the power and authority to make such changes in the location of the tracks and roadbed of the Public Belt Railroad System as may by said city be deemed necessary or proper. ·The control, administration, management and supervision of the construction, maintenance, operation and development of the Public Belt Railroad of the city of New Orleans shall be exclusively vested and remain in such board or commission, which shall always be separate and distinct from that of any railroad entering the city of New Orleans, and no director, officer or employé of any state or interstate railroad shall ever be allowed to act as a member of said commission, or as an officer of the Public Belt Railroad, or be employed by said Public Belt Railroad, and no rights or privileges shall be granted to any railroad company to control, manage, use or operate the said Public Belt Railroad System, or any part thereof, and said Public Belt Railroad System shall be and remain the sole property of the people of the city of New Orleans at all times, and shall in no way or manner ever be hypothecated or alienated, provided, however, that the revenues of said Public Belt Railroad of the city of New Orleans, after the deduction of the expenses of maintenance and operation, shall be and remain pledged for the payment of the bonds in principal and interest, the issue of which is herein authorized; to such extent as may be necessary under this act."

When this act and constitutional amendment was adopted a board or commission had already been organized for the purpose of constructing, equipping, maintaining, and operating said Belt Railroad System, and a considerable portion of said railroad had already been constructed. and equipped, and had been in actual operation for some years. This belt railroad had been from its origin under the charge of a board or commission, and this board or commission had been reorganized in 1904 by Ordinance No. 2683, New Council Series, which provided, as follows:

"Section 1.—That section 1 of Ordinance No. 147, N. C. S., adopted by the council of the city of New Orleans, on August 7, 1900, be amended and re-enacted so as to read as follows, to wit: That a board of commissioners be and the same is hereby created, to be known and styled as the Public Belt Railroad Commission,

for the city of New Orleans, to be composed of the mayor of the city of New Orleans and sixteen citizen taxpayers of the city of New Orleans, who shall be duly qualified electors and shall have resided in said city for a continuous period of five years prior to their appointment, to be appointed by the mayor of the city of New Orleans, by and with the approval of the council of the city of New Orleans, and as follows: Three members of the New Orleans Board of Trade, upon the recommendation of the said New Orleans Board of Trade; two members of the New Orleans Cotton Exchange, upon the recommendation of said New Orleans Cotton Exchange; two members of the New Orleans Sugar Exchange, upon the recommendation of said New Orleans Sugar Exchange; two members of the New Orleans Progressive Union, upon the recommendation of said New Orleans Progressive Union; and two members of the Mechanics, Dealers and Lumbermen's Exchange, upon the recommendation of said Mechanics, Dealers and Lumbermen's Exchange; and five members to be appointed from the citizens of New Orleans at large, three of whom shall be from that portion of the city above Canal street, and two of whom shall be from that portion of the city below Canal street; should any of the foregoing organizations cease to exist or be without a legal successor, the members appointed therefrom shall serve out their allotted terms, and their successors shall thereafter be appointed by the mayor, by and with the consent of the city council.

"The tenure of office of the first appointees shall be as follows: Two for two years, two for four years, two for six years, two for eight years, two for ten years, two for twelve years, two for fourteen years, and two for sixteen years; all terms to date from date of appointment. The successors of the first appointees shall be appointed for terms of sixteen years from the dates of original appointment. The mayor of the city of New Orleans shall be the president of said commission and shall have a right to vote at all meetings and upon all questions.

"The city attorney shall be ex officio attorney of said commission, and the city engineer shall be ex officio engineer of said commission, and said commission shall have power and authority to employ additional counsel and engineers whenever necessary. Such additional counsel and engineers to be selected and named by the commission, and to be appointed by the city attorney and the city engineer, respectively, upon the recommendation and designation of the commission, the appointments to be subject to confirmation by the council of the city of New Orleans.

"Within thirty days after the appointment and confirmation of the original appointive members of said commission, said commission shall meet in the council chamber of the city of New Orleans and shall organize. Said commission shall select a president pro tem., a sec-retary-treasurer, and industrial commissioner, an auditor and a general manager. The president pro tem. shall be a member of said commission and shall have active charge, control, management and supervision of the business of said commission, subject to the direction of said commission; he shall preside at all meetings of the commission, in the absence of the mayor, and shall perform such other duties as the commission may designate. The secretary-treasurer shall keep the books, papers, records and minutes of said commission, and shall receive and deposit in such bank or banks as the commission may designate all moneys, funds and property accruing to the commission, and shall perform such other duties as said commission may designate, but no disbursements shall be made of any of the funds of said commission except after approval of the vouchers by a finance committee, composed of three members, to be appointed by the president of said commission. All checks, warrants or other vouchers for the payment of the money shall be signed by the secretary-treasurer and countersigned by the mayor. Said finance committee shall perform such other duties as may be designated by said commission.

"It shall be the duty of the auditor to check and audit all the accounts, receipts and disbursements of the commission, and to perform such other duties as said commission may designate.

"It shall be the duty of the industrial commissioner to furnish, free of charge, general information concerning the Public Belt Railway, its connections and facilities, the advantages it offers to shippers and carriers, and to publish and circulate maps and other data and information to investors, whether in the city of New Orleans or elsewhere, and to all ,erchants, manufacturers and persons desiring to locate along the line of the Public Belt Railway.

"The secretary-treasurer, the auditor and the industrial commissioner shall be elected by a majority of the commission and shall hold office subject to the pleasure of the commission.

"The general manager shall be charged with the physical construction, maintenance, operation and development of said Public Belt Railway. He shall be a person of established reputation as a practical belt railway operator and shall be elected by a two-thirds vote of the commission and shall hold his office subject to the pleasure of the commission. He shall be at all times subject to the supervision and control of the president pro tem. of the commission.

"No member or officer of said commission shall receive any salary or other compensation for services, except the secretary-treasurer, the auditor, the industrial commissioner and general manager, whose salaries shall be fixed and provided for by said commission whenever said commission shall deem it advisable, but said commission shall not be obliged, except within its discretion, to allow or pay any salary or compensation to any officer, and shall

have the right to combine together any of the offices provided for by this ordinance, except those of president and president pro tem., which shall remain as herein constituted; the president pro tem. shall always be selected from the members of the commission, appointed upon the recommendation of the business exchanges."

By Act No. 159 of 1912, the so-called commission form of government was adopted for the city of New Orleans. The commission council of the city, under this new form of government, at its organizaton in December, 1912, adopted an ordinance, being its Ordinance No. 1, entitled

"An ordinance organizing the several departments of government of the city of New Orleans, in accordance with the provisions of act No. 159 of 1912."

The second paragraph of section 4 of that ordinance provided that the commissioner of the department of public utilities—

"shall have full and active charge, management, direction, operation and control, under such rules and regulations as he may adopt, of the Public Belt Railroad System of the City of New Orleans; which system shall be operated and conducted under the name of 'The Public Belt Railroad of the City of New Orleans;' and his official signature to all matters concerning said Public Belt Railroad System of the city of New Orleans shall be that of 'Commissioner of Public Utilities.'"

The commissioner of public utilities was the defendant, William B. Thompson. At that time he was already a member of said public belt commission, as the representative from the Cotton Exchange, and he was also the president pro tem., having been elected such by said commission.

On January 13, 1913, relators instituted this suit to enjoin the execution of said second paragraph of section 4 of Ordinance No. 1, and to have it declared illegal, on the ground that it vested in the commissioner of public utilities the control of the operation and management of the Public Belt Railroad, and thereby divested the exclusive control which was guaranteed to be vested and to remain in said board of commissioners of the

134 LA.—30

Public Belt Railroad by section 7 of Act No. 179 of 1908.

This divestiture of exclusive control was said to result from the fact that, whereas theretofore the executive officer of the commission had had "active charge, control, management, and supervision of the business of said commission, subject to the direction of said commission" and had had to "perform such other duties as the commission may designate," he, under this new ordinance, was to have "full and active charge, management, direction, operation, and control, under such rules and regulations as he may adopt, of the Public Belt Railroad System" so that he should no longer be subject to the direction of the commission, and should no longer be required to perform such other duties as the commission might designate, but should have the full and active charge, management, direction, operation, and control of the entire Belt System under such rules and regulations as he himself might adopt.

A few days after the filing of this suit, to wit, on January 21, 1913, the commission council adopted the ordinance now sought to be enjoined, which is Ordinance No. 74, Commission Council Series.

This ordinance repeals the hereinabove transcribed second paragraph of section 4 of Ordinance No. 1, Commission Council Series, theretofore sought be be enjoined.

It amends Ordinance No. 2683, New Council Series of 1904, by adding the commissioner of public utilities to the membership of the Public Belt Railroad Commission, and by abolishing the office of president pro tem. and creating, in its place, that of acting president, and providing that the commissioner of public utilities shall be the acting president of the commission; and it then provides, as follows:

"The Commissioner of public utilities of the city of New Orleans shall, as aforesaid, be the acting president of the commission. In the absence of the president (that is, the mayor), he

shall preside at all meetings. He shall have active charge, management and control of the detail operations of the Belt Railroad System, and the heads of the several departments of accounting, operation and engineering shall report to him and take instructions from him. He shall report to the commission and keep the same fully advised of all matters falling within his management, and shall be the agent through whom the general directory powers of the commission shall be executed. His official signature in all matters relating to said Public Belt Railroad shall be 'Commissioner of Public Utilities, Acting President Public Belt Railroad Commission.' "

Upon the adoption of this ordinance, the suit filed by the relators to enjoin the carrying out of the repealed ordinance was practically discontinued, it having become functus officio, and the present suit was filed by means of a supplemental petition. The contention is that this new ordinance contains the same obnoxious feature of divesting the Belt Commission of the exclusive control of the operation and management of the Belt Railroad and investing the commissioner of public utilities with same.

That contention appears to us to be well founded. In section 7 of said Act No. 179 of 1908, now a part of the Constitution, and whose provisions are by section 8 of the act itself declared to constitute a contract between the holder of the bonds and the city of New Orleans, it is provided that "the control, administration, management and supervision of the construction, maintenance, operation and development of the Public Belt Railroad of the City of New Orleans, shall be exclusively vested and remain in such board or commission" and the effect of said ordinance is to vest the said "control," etc., in the commissioner of public utilities.

"He shall," says the ordinance, "have active charge, management and control of the detail operations of the Belt Railroad System, and the heads of the several departments of accounting, operation and engineering shall report to him and take instructions from him."

To have active charge, management, and control of the detail operations of a railroad system, and at the same time to receive all reports and give all orders in the departments of accounting, operation, and engineering of that same railroad system, is to have practically complete charge and control of the management and operation of that railroad.

Theretofore the president pro tem. had exercised these functions, or most of them; but he was the mere instrument through which the board was acting; he was appointed by the board and was removable at its pleasure, so that his acts were those of the board; it was the board acting through him.

But under this ordinance this officer is to be no longer appointed by the board or removable by it; it has no longer any control over him; his acts are his own, not those of the board; the "control," etc., which he exercises is his own, not that of the board, so that it is he who has "control," etc., not the board.

True, he is required to report and keep the board advised of his acts; but the board is left no authority to control his course in anything. The board is to be informed of what has been done, not of what is to be done; it is to know of things only after they have been done; and, if it disapproves of what has been done, its disapproval amounts to nothing at all, since it is helpless to do anything.

True, also, the ordinance speaks of his having to be "the agent through whom the general directory powers of the commission shall be exercised," thereby implying that directory powers of some kind are left to the commission; but after the active charge, management, and control of the detail operation of a railroad system, together with the control of the accounting, operating, and engineering departments of the system, has been taken away from the governing body of the system, we do not see what margin is left within which any directory powers of any kind could be exercised. The functions thus

enumerated cover practically the entire field. This provision, requiring that whatever directory powers might be left to the commission should be exercised through this officer, seems to have been added as a precautionary measure, in order that in the event some authority should have been left to the commission, it should not be exercisable except through this officer, over whom the commission has no control.

It is noteworthy that the defendant W. B. Thompson, who as commissioner of public utilities is thus given charge of the Belt Railroad was, at the date of the adoption of this ordinance, president pro tem. of the Belt Railroad Commission, and as such had already the "active charge, control, management, and supervision of the business of said commission," and that the only difference between his then status and his status under this ordinance is that, whereas he was then "subject to the direction of the commission," and was appointed by it and removable at its pleasure, he now no longer derives his tenure of office from the commission, and is no longer subject to its direction, so that, except to emancipate said defendant W. B. Thompson from the control of the board, there seems to have been no present occasion for passing said ordinance.

So far as we can see, the entire "control, administration, management, and supervision of the construction, maintenance, operation and development of the Public Belt Railroad" is vested by this ordinance in the commissioner of public utilities, and no part of said authority is left to the board, but, even if the entire authority in the premises were not thus taken away from the board and transferred to said commissioner, but only a part, or even a small part at that, the legal situation would be the same; for the said act and constitutional amendment, part of the contract with the plaintiffs, requires that said authority should be vested exclusively in said board, and therefore the taking away of any part is as clear a breach of said act and constitutional amendment as would be the taking away of the whole.

In defense of this ordinance it is said that the said act and constitutional amendment leaves to the city of New Orleans the power to reorganize the Belt Railroad Commission and to prescribe its powers, duties, and functions, and that said ordinance has done no more than this.

It is said also that "the control, administration, management, and supervision of the construction, maintenance, operation, and development" of the Belt Railroad is not taken away from the commission and vested in the commissioner of public utilities, because only section 1 of the Ordinance 2683, New Council Series, of 1904, is amended; that section 2 is left unamended and in full force and operation, and that it provides, as follows:

"The commission is hereby authorized and empowered to make, enforce, repeal and amend all rules and regulations covering the belting, switching and generally the movement of trains, locomotives, cars and traffic on and over said Public Belt Railroad, which shall be under the exclusive direction, control and management of said commission."

The answer to the first of these contentions is that, even conceding, for the argument, that this authority given to the city to reorganize the board and prescribe its powers, duties, and functions did not have to be exercised before the issuance of the bonds, but can be exercised at any time, the fact remains that the city is forbidden to vest the control, administration, management, and supervision of the construction, maintenance, operation, and development of this Belt System, in whole or in part, in any other functionary than a board, either the one already constituted, or some other thereafter constituted, but still a board, and that to say it does not ·undertake to do this by this ordinance is simply to deny a plain fact. The commissioner· of public utilities is not ap-

pointed by said board, and is not removable by it, and yet he is charged with the entire operation of the road, and with the bulk of its other business; and the general powers left to the board, whatever they may be, are required to be executed through him, without any control whatever being allowed over him.

The answer to the second of said contentions is that the said provision of section 2 of Ordinance 2683, N. C. S., conferring upon the board .exclusive control in the several matters mentioned, is in conflict with said ordinance 74, Commission Series, in so far as the latter gives to the commissioner of public utilities control of some, if not most, of these same matters, and is therefore repealed by it.

It is also said that it is only of the detail operations of the railroad that he is to have active charge, management, and control, not of that part of the operations which is not detail. The answer of this contention is that if by "detail operations" were meant the minutiæ of the operations, in such way that the authority of the commissioner would be restricted to mere details, or unimportant, petty, trifling, matters, the argument might have some force; though even then it would fail to its purpose, since the authority of the board would by that much not be "exclusive," and the said act and constitutional amendment would be by that much violated; but, despite the presence of the word "detail" in said ordinance, as qualifying the word "operations," the obvious meaning is that the commissioner is required to have charge, management, and control of the entire working or activities, of the railroad; for a railroad does not have two operations, one detail and the other not detail; it has but one operation.

Having thus found that the exclusive control required by said act and constitutional amendment part of the contract of the plain-tiffs, to be vested in the said board is in part divested by said ordinance and vested in said commissioner, we pass to the question whether the contract of the plaintiffs is thereby impaired.

Manifestly it is. One of the considerations of the issue of the bonds was the express guaranty that the control of the operations and management of the road should be exclusively vested and remain in the board. There were reasons, and powerful ones, why this Belt Road, designed to serve impartially the various commercial interests of the city, should be confided to a board, and not to any one single individual; but with these reasons the courts have nothing to do. Suffice it for the courts that such is the imperative requirement. One consideration which touches the holders of the bonds directly is that the prompt and easy payment of the interest and capital of their bonds depends upon the successful operation of the road, which in turn depends upon the character of the management of the road. Having contracted for a particular kind of management they are entitled to have this management continued, and not substituted by another that might prove disastrous. They do not have to show that it will prove disastrous, or even that it is likely to; all they have to do is to show that it is a change, and that they are opposed to a change. Dartmouth College v. Woodward, 4 Wheat. 518–653, 4 L. Ed. 629–663. See, also, Planters' Bank v. Sharp, 6 How. 301, 12 L. Ed. 447; Walker v. Whitehead, 16 Wall. 314, 21 L. Ed. 357; also Board v. Municipality No. 1, 6 La. Ann. 21; Carey Library v. Bliss, 151 Mass. 364, 25 N. E. 92, 7 L. R. A. 765.

Despite the express declaration in the act and constitutional amendment by which the issuance of the bonds was authorized, that the several provisions of said acts should constitute a contract between the holders of the bonds and the city of New Orleans, it is

contended by the defendant that there is no contract; and the reason assigned for there not being any is that this Belt Commission is not a private corporation but a public functionary. We do not see what that has to do with it. It was possible for the city of New Orleans to enter into the contract evidenced by these bonds, and the statuté under which the bonds were issued is expressly declared to be part of the contract of these bonds. After this, we do not see that any room is left for discussion as to there being or not a contract.

The representation to the purchasers of the bonds that the control, administration, management, and supervision of the construction, maintenance, and operation and development of the road, should be vested and remain in a board or commission, and should be part of the contract of the bonds, was made not· only through and by means of the publication of the act and constitutional amendment under whose provisions the bonds were issued, but also by the publication and circulation of a prospectus in which were set forth the advantages and guaranties of the bonds, and among them this one in particular. This representation was therefore doubly made a part of the contract of said bonds.

We' do not know that anything further need be said touching the existence of a contract and its impairment by the proposed change; but it may not be amiss to mention a suggestion made with great force in the brief of the learned counsel for plaintiffs. It is that the valuable rights and privileges enjoyed along the river front of the city by the Belt Railroad are dependent upon the approval and consent of the Dock Board, and that this consent has been given only conditionally, on the condition—

"that this approval shall remain in force and have effect only as long as the Public Belt Railroad shall be exclusively operated, managed, and controlled by said Belt Railroad Commission; the violation of any of the above stipulations shall, ipso facto, determine and annul all the rights and privileges granted to the Public Belt Railroad Commission of the City of New Orleans."

It is suggested that these rights and privileges, indispensable as they are to the success of this Belt Railroad, would be jeopardized by the proposed action of withdrawing the exclusive operation, management, and control of said Belt Railroad from said Belt Railroad Commission, and transferring same, in whole or in part, to a single individual.

The nature of the case being now fully understood, the contention that it is not one in which the decision of the trial court can be reviewed by certiorari may be briefly disposed of.

First, it is said that, on writ of certiorari, only the regularity of the proceedings, not the merits of the case, can be reviewed. See to the contrary, Brunner Mercantile Co. v. Rodgin, 130 La. 358, 57 South. 1004.

Next, it is contended that the appeal heretofore taken in this case was dismissed by this court by reason of the plaintiffs not having any pecuniary interest in the premises, and that a litigant with no pecuniary interest for appeal has none for certiorari. But this is a non sequitur. For appeal there must be a pecuniary interest in a determinate amount, $2,000 for this court, and $100 for the Court of Appeals; whereas, for certiorari the interest need not be determinate; suffices that there be one, albeit of an amount not susceptible of fixation. In re Dumser, 132 La. 967, 61 South. 994; no determinate pecuniary interest was involved, and yet the writ was granted, and the decision of the trial court was reviewed on the merits.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and that an injunction issue, as prayed, directed to William B. Thompson, commissioner of public utilities of the city of New Orleans, restraining and enjoining him from executing or enforcing, or attempt-

ing to execute or enforce, Ordinance No. 74, Commission Council Series, of the city of New Orleans, in so far as the said ordinance provides that the commissioner of public utilities of the city of New Orleans shall have active charge, management, and control of the detail operations of the Belt Railroad System, and the heads of the several departments of accounting, operation, and engineering shall report to him and take instructions from him, and that said commissioner shall be the agent through whom the general directory powers of the commission shall be executed; and, in general, in so far as said ordinance undertakes to make the said commissioner of public utilities the forced agent through whom said commission shall act for any purpose, and that in so far as the said ordinance operates to divest the Belt Railroad Commission of the exclusive control, administration, management and supervision of the construction, maintenance, operation, and development of the Public Belt Railroad of the city of New Orleans, and vest same in said commissioner of public utilities the same be and is hereby annulled. The defendant to pay all costs of this suit, except those incurred in connection with the appeal heretofore taken herein.

### On Rehearing.

MONROE, C. J. This case was originally brought before us by appeal, but the appeal was dismissed upon the ground that the court was without jurisdiction, quoad any interest disclosed by the plaintiff and appellant. 133 La. 209, 62 South. 634. The plaintiff and the New Orleans Board of Trade, Limited, an intervener which had joined the plaintiff, then applied to this court, and obtained a writ, or writs, of certiorari, by means of which the matter was again brought up, and, on December 15, 1913, a judgment was rendered decreeing Ordinance "No. 74, Council Series" illegal, in certain respects. Thereafter, within the legal delay, the relators herein presented a petition, praying for a rehearing, upon the question whether or not the ordinance "should be annulled, in whole," and its enforcement enjoined, or, in the alternative, whether the decree handed down should be amended to that effect (without a rehearing); and the rehearing was granted, "as to the matter complained of by relator, and restricted thereto." Later still defendants filed a petition, setting forth that, before the judgment thus mentioned had been rendered, to wit, on November 22, 1913, the Constitution of 1913 had been adopted, and the appellate jurisdiction of the Court of Appeal for the Parish of Orleans had thereby been so enlarged as to give relators a remedy by appeal to that court, and suggesting that this proceeding be now dismissed, and relators relegated to the remedy thus provided. To the suggestion so made, relators, through their learned counsel, make answer, setting up certain matters which we shall proceed to consider in the order in which they are presented, to wit:

[1, 2] 1. That defendants' suggestion is based upon a disregard of the saving provisions of the Constitution of 1913 itself, viz.:

"Art. 326. That no inconvenience may arise from the adoption of this Constitution, and in order to carry this Constitution into complete operation, it is hereby declared:

\*     \*     \*     \*     \*     \*     \*

"Second.—All writs, action, causes of action, proceedings, prosecutions and rights of individuals, or bodies corporate, and of this state, when not inconsistent with this Constitution, shall continue as valid and in full force and effect."

Article 98 of the Constitution of 1898 reads as follows:

"The Courts of Appeal, except as otherwise provided in this Constitution, shall have appellate jurisdiction, only, which jurisdiction shall extend to all cases, civil or probate, when the matter in dispute or the funds to be distributed shall exceed one hundred dollars, exclusive of interest, and shall not exceed two thousand dollars, exclusive of interest."

As amended and incorporated in the Constitution of 1913 (which became effective on November 22, 1913), the article reads:

"Art. 98. The Courts of Appeal, except as otherwise provided in this Constitution, shall have appellate jurisdiction, only, which jurisdiction shall extend to all cases, civil and probate, of which the civil district court for the parish of Orleans or the district courts throughout the state have exclusive original jurisdiction and of which the Supreme Court is not given jurisdiction, when the matter in dispute or the fund to be distributed shall not exceed $2,000, exclusive of interest, and all appeals shall be on the law and the facts."

There is therefore no doubt that, upon November 22, 1913, the Court of Appeal for the parish of Orleans became vested with appellate jurisdiction of this case, and it is equally beyond doubt that the case was not then, and is not now, within the appellate jurisdiction of this court. It is said, however, that, then, and now, this court was and is vested with jurisdiction to review the judgment of which relator complains, by means of the writ of certiorari, and it is unquestionably true that this court possessed such jurisdiction at the time that the writ mentioned was issued, but it is not so clear that it can rightfully or consistently exercise that jurisdiction at this time. The jurisdiction in question, so far as it has been, or may be, exercised, is derived from article 94 of the Constitution of 1898 and article 94 of the present Constitution, which are identical in terms, and read:

"Art. 94. The Supreme Court shall have control and general supervision over all inferior courts. The court, or any justice thereof, shall have the power to issue writs of certiorari, prohibition, mandamus, quo warranto, and other remedial writs."

It is too plain to require demonstration that, in the grant of "control and general supervision over all inferior courts," the framers of the Constitution had no intention of conferring upon this court authority to assume, in general, the original, or appellate, jurisdiction specially conferred by other articles of the Constitution upon the different inferior courts; and for this court so to do would be for it grossly to abuse its broad mandate. The intention was to lodge in this court the power to control and supervise the inferior courts with respect to the manner in which they discharge their functions; that is to say, the power so to control and supervise them as to secure the competent and efficient discharge, by them, of the functions imposed upon them, and to afford relief in those cases where there is well-founded complaint of failure in that respect and no other adequate remedy. The article quoted confers upon each of the justices of this court, as well as upon the court itself, the power to issue the writs mentioned, but otherwise it is framed in the same language as article 90 of the Constitution of 1879, which was construed, for the first time, in the case of State ex rel. Kramer v. Judge, 32 La. Ann. 218, the case being one from the judgment in which there was no appeal, and in which the relator complained that the evidence upon which the judgment was based was insufficient to justify it. In declining to grant the relief prayed for, Manning, C. J., as the organ of this court, said:

"This is the first application to this court for the exercise of the supervisory power over the inferior tribunals conferred by article 90 of the new Constitution. * * * The use of the writ [of certiorari] is not confined to those cases [specified in C. P. 857], but we desire to move very cautiously in defining the objects which it may be made to subserve, and we shall content ourselves with saying that the relator is not entitled to it in the present case. To hold otherwise would enlarge the jurisdiction of this court so as to embrace every conceivable suit before every court, and nullify practically the article of the Constitution which defines our jurisdiction. The grant to this court of supervisory powers over the inferior tribunals is very broad, but we do not think it was intended to include an unappealable case, where the sole ground of complaint is that the evidence, upon which the judgment was rendered, was insufficient to justify it."

In State ex rel. City v. Judge, 32 La. Ann. 552, the court, through Mr. Justice Fenner,

laid down some general rules by which it announced that it would be governed in the exercise of the jurisdiction conferred by the article in question, and, after specifying certain cases, in which there would otherwise be no remedy, continued as follows:

"4. In the exercise of the power in the cases above indicated, we wish it distinctly understood that we shall respect the independence of inferior courts in the determination of all questions confided to their judicial discretion, and shall not usurp merely appellate jurisdiction not conferred upon us by the Constitution. It will be useless to apply to us for the exercise of this power over inferior courts not subject to our immediate appellate jurisdiction in any case except when there is a clear usurpation of power not conferred by law, or a refusal to perform some duty plainly imposed by law, and which they have no discretion to refuse, and when there is an entire absence of other adequate remedy."

In State ex rel. Weber v. Skinner, 32 La. Ann. 1092, Bermudez, C. J., speaking for the court, said:

"A writ of certiorari cannot be granted in a case in which there exists a remedy by appeal."

In State ex rel. City of New Orleans v. Judge, 52 La. Ann. 1277, 27 South. 698, 51 L. R. A. 71 (1900) it was said:

"There is no doubt that the more common, and the preferable method of bringing up questions of this kind is by appeal. But it is equally unquestionable that, where there is no remedy by appeal, or where an appeal will not afford adequate relief, or meet the ends of justice, the power exists in this court, in the exercise of the supervisory jurisdiction conferred upon it by the Constitution, to interpose its authority by means of some remedial writ or order. It was with the view that the broadest latitude should be allowed in this respect, and that no case, and no litigant, should be beyond the reach of its protection, that the Constitution of 1879 conferred upon the Supreme Court, in addition to its appellate jurisdiction, 'control and general supervision over all inferior courts'; * * * and that the present Constitution (of 1898) * * * confers the same authority, in the same language, and makes the grant more effective by authorizing, not only the court, but, 'any justice thereof' to issue the writs necessary to afford relief, and especially authorizes the review of the decisions of the Courts of Appeal, 'by certiorari or otherwise.'. If, therefore, a litigant is aggrieved by the action of any inferior tribunal, and no other adequate remedy is provided by law, he is entitled to invoke the authority thus vested in this court for his relief. If his case can be brought here by appeal, then, ordinarily, he should avail himself of that remedy. But if the particular remedy thus provided should be inadequate and should afford no relief, with respect to his grievance, he is entitled to a remedy in some other form, since the power of this court is not restricted to granting relief in cases which may be brought before it by appeal, but extends to all cases cognizable by the inferior courts of this state; and the case of a litigant, who is entitled to an appeal, but who can derive no benefit therefrom, does not differ in this respect from that of one who has no right of appeal, the question to be determined being whether the grievance complained of, *considered* with reference to its character, and *with reference to the existence or nonexistence of other adequate remedies*, is such as to justify the interposition of the authority of this court." (Italics by the present writer.)

In State ex rel. Jaubert Bros. v. Leche, 113 La. 1, 36 South. 868, it was said:

"Relators cite article 94 of the Constitution of 1898: * * * This court has the control delegated by this article, it is true. It does not follow that it will issue a writ of certiorari and prohibition in a case that is clearly appealable to the Circuit Court of Appeal. This court has repeatedly decided that in a clear case of a right to an appeal the remedy is by appeal to the court of competent jurisdiction."

In First National Bank v. Richardson, In re, 123 La. 724, 49 South. 486, it was said:

"The rule is well settled that this court will not interfere by the exercise of its extraordinary powers in a case where there is adequate remedy by appeal."

And in State ex rel. Rossner v. Berthelot, 131 La. 367, 59 South. 773, it was said (of the jurisdiction conferred by article 94 of the Constitution):

"That jurisdiction is intended to be exercised in cases where the law provides no remedy by appeal, or where such remedy is likely to prove inadequate."

Many other opinions have been handed down, to the same effect as those from which the foregoing excerpts have been taken, and there can be no doubt that, from the time that this court was granted the jurisdiction which is here invoked, it has uniformly and repeatedly held that the intent and purpose

of the grant was, and is, not to authorize it to exercise powers conferred upon, and properly exercised by, other courts, but to provide an instrumentality for the correction of errors committed by such other courts whilst exercising the powers conferred upon them, in cases where no other remedy is provided, or, where the remedy, as provided, is inadequate; and, as it is the function of this court to interpret the law, in the last resort in this state, save in cases in which its decisions may be reviewed by the Supreme Court of the United States, it follows that article 94 of the Constitution must be taken to mean what it has been so held to mean, and hence that it cannot be successfully invoked to sustain the jurisdiction of this court to review, by means of the writ of certiorari, a judgment for the review of which the remedy by appeal to another court is an adequate one.

It is quite clear, then, that, if the remedy by appeal had existed, for the purposes of this case, when the application for the writ of certiorari was made, the exercise by this court of the power to review the judgment complained of, by virtue of that writ, would have been inconsistent with the Constitution, as we have interpreted it; and the case is the same, as the matter stands, since the constitutional provision, creating the remedy by appeal and vesting jurisdiction of the appeal in another court became effective, at once, and we can proceed with the exercise of jurisdiction which was thereby vested in the Court of Appeal with no greater propriety than we could originally have assumed such jurisdiction under the conditions stated.

[4] "Jurisdiction (says the Supreme Court of the United States) is the power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause. And this is not less clear upon authority than upon principle." Ex parte McCardle, 7 Wall. 506, 19 L. Ed. 264.

"If a case is appealed (says Judge Cooley) and, pending the appeal, the law is changed, the appellate court must dispose of the case under the law in force when its decision is rendered." Cooley on Constitutional Limitations (5th Ed.) p. 471, § 381.

The saving clause upon which relators rely is the same as that contained in the Constitution of 1898; nevertheless, this court, in Cassard v. Tracy, 52 La. Ann. 835, 27 South. 368, 49 L. R. A. 272, held (on rehearing), that because, pending the appeal, the Constitution of 1898 had conferred upon the appellate court jurisdiction as to the facts, as well as the law, the judgment appealed from should be set aside and the case remanded, in order that the facts might be made to appear. The syllabus in the case reads (quoting in part):

"The moment the Constitution of 1898 went into effect appeals then pending in the Court of Appeals became entitled to consideration, not from the point of view of the jurisdiction conferred upon the court by the Constitution of 1879, but from the point of view of * * * the Constitution of 1898."

The Chief Justice and the writer of this opinion dissented, in the case thus quoted, upon the grounds that the judgment appealed from had become so far final as to be the property of the plaintiff, in whose favor it had been rendered; and, that the provision of the Constitution which was interpreted was not intended to operate retroactively.

When the Constitution of 1913 went into effect, the case now under consideration was pending in this court, not upon appeal, for, up to that time relators had no right of appeal, but by virtue of the writ which this court had directed to be issued, *because* relators had no right of appeal, or other method, by which, or court in which, to obtain the review of a judgment of which they complained. In that situation the Constitution of 1913 went into effect, and it enlarged the appellate jurisdiction of the Court of Appeal so as to include an appeal from that judgment, so that, when this court, being

unaware of the change, proceeded to decide the case, it ousted the jurisdiction specially conferred upon another court, and exercised the supervisory jurisdiction, conferred, in general terms, upon it, for a purpose which it had uniformly and repeatedly declared that the Constitution did not intend that it should be exercised, which is to say that it exercised a jurisdiction which it has often held that it does not possess; for assuredly it is not vested with jurisdiction which the Constitution, as interpreted by it, did not intend to confer upon it.

[3] 2. That defendants' suggestion is based upon a misconception of the scope and effect of the rehearing that was granted in the case; that:

"It is not true * * * that the entire controversy is at large. On the contrary, the case is closed, except as to the question upon which alone the rehearing was granted, and to which it was expressly restricted; and the judgment upon [as to] that portion of the decree which was not included in the rehearing is final."

The object of the suit is stated in the opinion heretofore handed down as follows, to wit:

"The relators herein * * * as holders of three of the $1,000 bonds of the Public Belt Railroad of the City of New Orleans, complain that the contract of said bonds will be impaired if a certain ordinance, passed by the commission council of the city, is carried into effect, and they ask for an injunction."

In other words, plaintiffs ask that the ordinance be declared illegal and its execution enjoined.

The decree which was handed down injoined the commissioner of public utilities from executing the ordinances, in so far as it provides:

"That he shall have active charge, management, and control of the detail operations of the Belt Railroad System, and that the heads of the several departments of accounting, operation, and engineering shall report to him and take instructions from him, and that said commissioner shall be the agent through whom the general directory powers of the commission shall be executed; and, in general, in so far as said ordinance undertakes to make the said commis-sioner * * * the forced agent, through whom said commission shall act, for any purpose; and that, in so far as the said ordinance operates to divest the Belt Railroad Commission of the exclusive control, administration, management, and supervision of the construction, maintenance, operation, and development of the Public Belt Railroad of the City of New Orleans, and vest the same in said commissioner, the same be, and is hereby, annulled."

The petition for rehearing reads, in part:

"That the ordinance No. 74 * * * should be annulled, in whole, for the following, among other, reasons, to wit:

"First. Because the entire ordinance was part of one common purpose, to vest the control of the * * * railroad in the commissioner, * * * and, said ordinance having been annulled as to the investiture of such control in said commissioner, * * * said ordinance should be annulled in whole.

"Second. Because the council of the city was without authority, after the issue of the bonds, under the Act No. 179 of 1908, whereby the exclusive control of the Belt Road was vested in * * * such * * * commission, to add the commissioner of public utilities as a member thereof, or to reorganize the said commission at all by adding to or decreasing its membership.

"Wherefore petitioners pray that a rehearing be granted, upon the question whether said Ordinance No. 74 * * * should be annulled in whole, and that the said ordinance be annulled in whole, and its enforcement enjoined, or, in the alternative, that the decree herein be amended so as to, decree the nullity of said ordinance in whole, and the defendants enjoined from enforcing, or attempting to enforce, the same," etc.

The rehearing was granted in the following terms, to wit:

"Rehearing granted as to matters complained of in relators' petition and restricted thereto."

The application for the rehearing was made within the delay allowed by law for that purpose, and has the effect of preventing the judgment from becoming final. The proposition that, under such circumstances, a judgment becomes final so as to pass entirely beyond the control of the court as to some part of it and not as to other parts is untenable, and the granting of a rehearing with a restriction should, and must, be construed to mean merely that this court desires further enlightenment upon particular points, and not upon others. The object of

the application for rehearing in this case was to prevent the judgment from becoming final, because the applicants desired that, either upon rehearing, or by an order of court without a rehearing, it should be amended, and it was felt that it would be too' late to amend it if it were allowed to become final, and, in fact, it *is* to late if it *has* become final. The court, however, never intended to render two judgments in the case, nor yet, to leave it partly decided and partly undecided.

The law provides that the judgment of this court shall become final on the 15th calendar day after rendition, unless the last day shall fall on a legal holiday; "provided, that, in the interval, parties in interest shall have the right to apply for rehearing," etc. Act No. 223 of 1908.

Code of Practice:

"Art. 912. In the interval between the day on which the judgment is rendered and that on which it becomes final, a party dissatisfied with the judgment may apply to the court for a new hearing in the cause, and for this purpose shall present a petition, in which he shall state substantially, the reasons for which he thinks the judgment erroneous."

"Art. 913. The court shall consider of the reasons adduced in such petition, without argument, and if it grants a new hearing of the cause, shall state the points on which it wishes to hear the parties anew. *While the court is deliberating on this application, the three days (now* fifteen days) *allowed for rendering a judgment final do not run.*" (Italics by the court).

We have examined the cases of Levy v. Levy, 117 La. 779, 42 South. 267, and Lahn Co. v. Carr, 120 La. 797, 45 South. 707, to which we have been referred, and, whilst there is, perhaps, some unguarded language used, we do not find that they sustain the views that, pending an application for rehearing in this court, the judgment becomes final, in whole or in part.

3. It is said that the petition to recall the writ of certiorari came too late; that this court will not, on rehearing, consider points not previously urged, and that defendants acquiesced in the judgment as rendered.

It is, however, conceded that, if the court was stripped of its jurisdiction by the Constitution of 1913, the delay of defendants could not confer jurisdiction; and, as we have already shown, the constitutional provision on which relators rely has uniformly, since its incorporation in the Constitution of 1879, been authoritatively construed to mean, and hence does mean, that the supervisory jurisdiction thereby granted was conferred on this court in order to enable it to afford remedies, in cases in which litigants would otherwise be without them, but not in order that it should exercise jurisdiction specifically conferred on other courts.

Finally, it is said that, by relegating relators to their appeal, they will be subjected to unnecessary hardship and delay, and that, however it may be decided by the Court of Appeal, the case will, in all probability, be again brought to this court. If, however, the views which we have expressed are well founded, the hardship and delay are not unnecessary, but are the inevitable consequences of the law, rightly interpreted; and if, as a further consequence, the case is again brought here, we shall endeavor to dispose of it, as we are now endeavoring to do, according to our understanding of the law.

For the reasons thus assigned, it is adjudged and decreed that this' proceeding be now dismissed, without prejudice to the rights of the litigants upon either side, whether from the fact of the application for, and issuance of, the writ of certiorari, the action heretofore taken by this court in the matter, or its present action. It is further decreed that relators pay all costs.

O'NIELL, J., takes no part.