SALVADOR CASTELLUCCIO FOR HIM-
SELF AND MINOR DAUGHTER,
LUCIA CASTELLUCCIO v.
CLOVERLAND DAIRY
PRODUCTS CO., INC.

---

(March 14, 1928. Opinion and Decree.)
(April 11, 1928. Rehearing Refused.)

---

(*Syllabus by the Court*)

1. **Louisiana Digest—Automobiles—Par. 4.**
A chauffeur of a large and high truck, familiar with the location where he is driving because he has driven up that street every day for years, the condition of the street and the sloping thereof, and seeing the conditions as they are ahead of him, who drives on said slope causing the truck to slip and knock down an iron post supporting the gallery of the building at said location, is guilty of negligence.

2. **Louisiana Digest—Damages—Par. 30, 56; Negligence—Par. 15, 16.**
Where a personal injury aggravates an existing ailment or disease, or develops a latent one, the person whose negligence caused the injury is liable to respond in damages for the aggravation of the disease as well as for the original injury. In such case the injury is the prime cause which opens the way to and sets in motion the other cause, and the latter cannot be regarded as the independent cause of the injury or damage, nor can the wrongdoer be allowed to apportion the measure of responsibility to the initial cause.

3. **Louisiana Digest—Judgment—Par. 8; Parties—Par. 17; Successions—Par. 10; Appeal—Par. 380.**
Under Civil Code, Art. 2315, as amended by Act No. 159 of 1918, when a husband who has secured judgment for damages for death of wife in trial court for himself and minor daughter, dies while the judgment from which suspensive appeal has been taken is pending in the appellate court, his right perishes with his death and his major children cannot be made plaintiffs in the cause.

Appeal from Civil District Court, Divisio "C". Hon. E. K. Skinner, Judge.

Action by Salvador Castelluccio for himself and minor daughter, Lucia Castelluccio, against Cloverland Dairy Products Co., Inc.

There was judgment for plaintiff and defendant appealed.

Judgment amended and affirmed.

Scott E. Beer, of New Orleans, attorney for plaintiff, appellee.

J. C. Henriques and Frank T. Doyle, of New Orleans, attorneys for defendant, appellant.

## OPINION

JONES, J.    Plaintiff claims for himself and minor daughter, aged seventeen, for personal injuries resulting in the death of his wife, twenty-two thousand five hundred and twenty-eight dollars ($22,528.00) damages as follows:

(a) His loss of support_____$5,000.00
(b) His loss of affection and care  5,000.00
(c) His share for pain and suffer-
    ing of the deceased_____ 5,000.00
(d) Medicine and doctor's bills____    28.00
(e) Daughter's loss of affection____ 2,500.00
(f) Daughter's share for pain and
    suffering of deceased_____ 5,000.00

He alleges that his wife, aged sixty-one and in good health, while waiting on the sidewalk, near the uptown river corner of Saratoga and Gravier streets, was, on January 10, 1924, struck on the head by an iron post, which had been negligently and carelessly knocked down· by the driver of defendant's truck; that the blow made her unconscious, fractured her skull and caused a wound three inches long on the side of her head; that she was carried at once to the Charity Hospital, where she remained suffering intensely until January 18, 1924, when she was taken home only to leave her bed when it was necessary to carry her back to the hospital for treatment which lasted until her death on February 6, 1924.

Defendant in his answer admits the accident, but denies negligence and avers that the truck was being driven up Saratoga street, a one-way street, toward Howard Avenue at a speed of approximately eight or' nine miles per hour about ten o'clock in the morning of the accident; that shortly after passing Gravier street the driver of the truck was compelled to turn to the left in order to pass a quantity of building material which extended from the lake side of the street to about the center of Saratoga street; that the surface of the street was wet and slippery because it had rained that morning; that Saratoga street is not a standard street, because asphalt had been placed over the cobble stones, and on the river side of the street just where the accident had happened, about four feet from the curb, the surface slopes at an angle of about forty degrees; that the street at this point is only twenty-two feet wide, and in attempting to pass the pile of building material which extended to the center of the street, the back wheel of the truck skidded toward the river sidewalk and caused the left rear part of the top of the truck to strike and knock down the iron post; that the driver of the truck was not guilty of negligence and that the accident was caused by the unusual slope in the street and the wet condition.

There was judgment for plaintiff individually for twenty-five hundred dollars ($2500.00) and as natural tutor for twenty-five hundred dollars ($2500.00).

Defendant has appealed suspensively and plaintiff has answered the appeal asking that the amount be increased.

While the case was pending in this court, the plaintiff died on December 28th, 1925, and on January 25th, 1926, an order was signed by the presiding judge of this court making the six major children of the deceased as his sole and only forced heirs parties plaintiff in their father's stead and permitting the daughter, who had been meanwhile emancipated, to prosecute the suit for herself.

Defendant in his able argument and brief strenuously insists on the following defensive contentions:

·(1) Due care and precaution on his driver's part and entire freedom from fault.

(2) No causal connection between the injury and the death.

(3) That the action brought by Salvador Castelluccio individually perished when he died and the major children of Mrs. Castelluccio can not be made parties plaintiff.

We shall consider these points separately in the above order.

The evidence shows that the big covered truck, used for hauling milk, was in good order; that it was controlled by a governing apparatus which prevented it from going more than twelve miles an hour; that it was proceeding slowly up Saratoga street and stopped almost where the accident happened; that Saratoga street, which is a one-way uptown street has very heavy traffic at this point; that one day 8400 cars passed there between 7 a. m. and 10 p. m.; that the street is twenty-two feet wide and the grade is not standard; that between a point four feet from the curb and the curb itself there is a drop of 1-2.10 feet in four feet; that there is a safe roadway sixteen feet wide in the middle of the street, the severe slope only beginning four feet from each curb.

The colored driver of the truck, who was working in the feed room of defendant at the time of the trial, testifies on direct examination that he was going up Saratoga street at six miles per hour; that he turned to the left in order to pass the building material in the street and his rear wheel skidded into a post at the corner.

On cross-examination he testified that he had passed that point driving a truck every day for years both in dry and wet weather on the way to Union Station for milk and never had an accident; that he did not know the width or heighth of his truck, but it was a high truck and he did not think two machines like his could pass in a street twenty-two feet wide; that there was a pile of building material in the street about three or four feet high, but he could not say how far it projected in the street; that there was sufficient space between the pile of building material and the left side of the street for the truck to pass; that he knew exactly where he was driving and could have stopped if he saw fit, but did not do so; that it seemed to him the top of the machine hit the post and the weight of the top knocked the post over; that immediately after the accident the back wheels of the truck were up against the curb and the front wheels further away from the curb. The record contains an admission that the width of the truck from mud guard to mud guard was six feet nine inches.

Rosie Flamingo, an Italian witness, testified that she saw the truck slip into the gutter and hit the post; that there was a pile of building material in the street 2½ feet high, but she could not say how far it extended, but it did not occupy one-half of the street.

Emma Stanley, a colored seamstress, testified that the building material extended into the street for one-third of the width and many automobiles passed that morning both before and after the accident.

Filbin, the owner of the garage just across the street, who was having the work done, said that the traffic was heavy that day both before and after the accident, that the building material came out into the street possibly 2½ feet, but there was still sufficient room for two trucks to pass without hitting the slope; that the contractor had covered the drain with a board so that they could dump the material half on the banquette and over the

gutter into the street; that they were not then using much sand 'and bricks because the rear of the building was about completed.

Seiler, the foreman, who was building the addition to the garage, testifies that they did not have much material that morning as they were finishing up the work; that the material did not extend into the street more than eighteen inches.

A fireman, witness for defendant, testifies that he was on the left-hand side, *because the traffic was so heavy*, but he did not know anything about the slope.

Defendant argues that users of the public streets have the right to presume that the city had constructed them properly and that plaintiff has failed to prove both charges of negligence, because the record shows that the driver was going slowly and not at a rapid rate as charged, and because the truck skidded into the post and was not driven against it as charged.

In support of his contention he cites the case of Jacobs vs. Jacobs, 141 La. 272, 74 So. 992, where the Supreme Court uses the following language:

"The rule is well established in the jurisprudence of this state that a person using a public highway, especially in an incorporated city, has a right to presume and act upon the presumption that the way is safe for ordinary travel even at night and that he is not required to be on the lookout for dangers or obstructions *to which his attention had not been called."*

In that case the plaintiff, who was a guest in the automobile of defendant, sued for damages for personal injuries and the facts of the case upon which the above quoted rule was based, are summarized in paragraph 8 of the syllabus, prepared by the court, which reads as follows:

"The driver of an automobile is not answerable in damages for personal injuries inflicted upon his guest in the car as a result of an accident, where the facts are: The driver had inquired about the condition of the thoroughfare, before entering it, and was informed that it was all right; the car, while traveling at a moderate speed on a prominent street, in a city, ran into an open canal extending across the thoroughfare, without any guard rail, barrier, red light or other warning of danger; the glare of an electric light between the driver and the canal prevented his seeing the danger until it was too late to stop his car while going at an ordinary speed; the driver had never traveled over the route before and had no knowledge of the dangerous situation, the guest in the car had traveled over the route several times before and was acquainted with the situation, but did not warn the driver or complain of the speed."

It will be noted that the driver had never traveled over the route before and had no knowledge of the dangerous situation, but in the instant case the driver says that he had been over *the street every day for years both in wet and dry weather;* that he knew exactly where he was driving and could have stopped if he saw fit.

A careful reading of the citations and other decisions quoted by defendant will show that the drivers had no knowledge either active or constructive of the existing defects, but here the defendant either knew or ought to have known the dangerous condition and the mere fact that his truck skidded is not sufficient in law to excuse him from the charge of negligence, if he knowingly drove his truck into a possibly dangerous place.

Defendant relies on the case of Williams vs. Holbrook, 103 N. E. 632, where the Supreme Court of Massachusetts held: "That the mere skidding of the car was not an occurrence of such uncommon or unusual character that, explained, the jury could say it furnished evidence of defendant's negligence."

In this case a boy standing on the sidewalk had been killed by an automobile, which suddenly skidded from a wet car track and the court, after holding that whether defendant was negligent or not was a question for the jury, maintained defendant's exceptions to a verdict for plaintiff.

In the course of the opinion the court uses the following words:

"The defendant's negligence, as we have said, depends upon the view the jury took of his acts in operating the car within instead of outside of the groove and then attempting to turn from the track by increasing rather than by lessening the rate of speed."

Thus the court holds that the acts of the driver prior to the skidding must be considered in determining whether the driver of the car was negligent and we concur in that ruling.

We think that the law about skidding being evidence of negligence is well stated in the case of Leftus vs. Pelletier, 111 N. E. 712, where the Supreme Court of Massachusetts said in a later case:

"It is true the mere fact of skidding is not evidence of negligence (Williams vs. Holbrook, 103 N. E. 633) but under all circumstances it was a question for the jury whether the skidding was *caused by defendant's negligence.*"

Here the defendant who had been over the road two or three times a week was held negligent by the court.

The law on the presumption as to the safety of streets is well stated in a quotation in defendant's brief reading as follows:

"Abbotts' Municipal Corporations, page 2348, Section 1047, reads as follows:
"PRESUMPTION OF CARE. The principle is well established that the traveler using a highway for a proper purpose in the absence of knowledge of the defect may lawfully presume that the public corporation has exercised, in respect to the condition of the highway he is using, that degree of care which the law imposed upon it. He is not bound, therefore, to be constantly on guard against defects which may cause him an injury. This presumption applies to all travelers using the highways, and at all times when they can be lawfully used, including both night and day. The assumption does not, however, operate to relieve him from the performance of his duties to use ordinary care and the traveler further can rely upon the principle only in the absence of knowledge on his part of the defect and when the danger is not an obvious and notorious one. Robertson vs. City of Wilmington, 32 Atl. 347; City of Dubuque vs. Burhyte, 173 Ill. 553; Atchison vs. Plumiett, 55 Pac. 677; Parette vs. Kansas City, 62 S. W. 448."

On the first point we agree with the judge of the lower court that the driver knew or should have known of the slope in the street and was therefore negligent when he drove sufficiently near the curb to cause his rear wheels to skid, although he had sufficient clear space to pass the building material safely. The defendant is, therefore, liable as a tort feasor, even if the city of New Orleans may also be liable for faulty construction of a street, a point which we do not decide, as the city is not a party to this suit.

We now take up the second point, the causal connection between the death and the injury.

The evidence shows that the deceased was sixty-one years old, weighed 180 lbs. and made a living for herself and husband by peddling vegetables; that she had been in good health prior to the accident nad had not been confined to her home for years; that the blow caused a wound on her scalp two or three inches long; that she was carried to the Charity Hospital in a dazed condition and kept there eight

days and then taken home, where she remained in the house, generally in bed; except when she was taken to the hospital for treatment; that she died on February 6th, the death certificate showing "cerebral hemorrhage" as cause of death.

The hospital report shows that the tentative diagnosis was probable fracture of the skull and the final diagnosis "fracture of inner table of skull vault," but the original X-ray pictures could not be found and the card signed by Dr. Granger, the man in charge, purporting to be a true copy of Mrs. Castelluccio X-ray report reads: "Fracture of the inner table of the skull."

Dr. Granger testified that he did not take the pictures and did not recall the case, but had every reason to believe the report correct.

Dr. Fortier testified that his X-ray picture taken February 1, 1924, showed no fracture. On cross-examination he stated that he would not declare the report of Dr. Granger untrue, although he could hardly believe it possible.

Dr. Gilbert, the family physician of deceased, testified that he had treated her for hardening of the arteries (Arterio Sclerosis) and high blood pressure; that he had treated her at home in bed some two weeks after the accident for nervousness and had dressed the wound and that, in his opinion, the injury contributed to the cerebral hemorrhage, because the shock had lowered her condition and probably her resistance; that death need not be immediate, but a blow of the kind would affect her adversely.

Dr. C. S. Holbrook, a specialist in nervous and mental diseases, who had never seen the patient, but had examined the X-ray plate and had read the hospital report, testified that he could not fix positively the cause of death, because there was no autopsy, but that in his opinion the blow was a contributing factor and that a woman of the age of the deceased would be more prone to a cerebral attack after such a blow than before and that very few old people get back to their former good health after a severe injury and that many months or years might elapse before the evil results of the blow, whether it caused a fracture or not, would become evident; that any latent or dormant disease would be aggravated by the blow, which is more serious with the old than with the young, and that the injury would probably be a most serious factor in the case.

Dr. Hountha testified that he had found the deceased at her home two or three weeks after the accident, lying across the bed in her street clothes; that he saw no evidence of paralysis; that the wound was only inflamed at the ear; that, in his opinion, the blow had no effect so far as the cerebral hemorrhage was concerned.

Dr. Carroll Allen, a distinguished surgeon of this city, who had not treated the patient, testified after carefully reading and analyzing the hospital report, that, in his opinion, the blow had not been a contributing cause of the death; that she would have died as she did, whether she had been struck or not; that she suffered some bad effects from the blow, that the case was a trivial one.

It is thus seen that two experts testify that the blow was a contributing factor to the death and two testify that it was not and there is no preponderance of evidence on this point.

Although the question is very close and the matter by no means free from doubt, we think sounder and more logical the conclusion of the family physician fo the ef-

fect that the shock caused by such a blow on a woman of sixty-one would necessarily lower her power of resistance and therefore be a contributing cause to her death, which occurred twenty-seven days later.

In the leading case of Lapleine vs. M. L. & T. R. R. Co., 40 La. 661, 4 So. 875, the Supreme Court uses the following words:

"The duty of care and abstaining from the unlawful injury of another applies to the sick, the weak, the infirm as fully as to the strong and healthy, and when that duty is violated, the measure of damages is the injury done, even though such injury might not have resulted but for the peculiar physical condition of the person injured or may have been aggravated thereby."

On this point see also Roth vs. Russell, 141 La. 581, 75 So. 418; Poncet vs. So. New Orleans Light & Traction Co., 3 La. App. 64.

In Ruling Case Law, vol. 8, p. 436, the rule is stated as follows:

"The defendant is responsible for a cancer where the injury caused by his negligence superinduced and contributed to its production or development or for death resulting from a disease where the injury rendered the system of the injured party susceptible to such disease and liable to be attacked thereby as a natural consequence."

We agree with the lower judge that the blow contributed to some extent in accelerating plaintiffs' death and although it is impossible to fix the relative importance of the contributing factors we affirm his finding to the effect that there was a causal connection between the accidental injury and the death.

In the case of Kerner et als. vs. Trans-Miss.-Terminal, 158 La. 853, 104 So. 740, which was a suit for damages for personal injuries to plaintiffs' brother resulting in his death, the Supreme Court, through Chief Justice O'Neill, in a learned opinion, discusses thoroughly the third point raised by defendant's counsel. In that case both Kerner and his wife were killed in a railroad accident, she dying instantly and he a few hours later. They had no children. His father was dead but his mother and the plaintiffs in the above suit, his brother and five sisters, survived him. His mother, who alone had the right of action for damages under Article 2315, C. C., as amended by Act 159 of 1918, brought suit but died before it was tried. Within a year after the accident the brother and sisters brought above suit for damages. In the course of his able opinion, the Chief Justice uses the following language:

"If one of the survivors who had thus acquired the right of action dies afterwards, his death does not affect the right of action of any other survivor, or confer a right of action upon any other survivor, for the right of action is not transmissible from one survivor to another survivor of the injured person, either by the general law of inheritance, or by virtue of the statute on the subject. The surviving relations of more remote degree, in whose favor the statute says the right of action shall survive in case of the death of the person injured, namely the major child or children in default of a surviving widow or widower or minor child, the surviving parent or parents in default of a surviving widow or widower or minor or major child, and the brothers and sisters in default of a surviving widow or widower or child or parent do not transmit the right of action from one to another to them, by the death of one of them, by the law of inheritance, or by virtue of the statute."

Plaintiff's able attorney admits that under decision in this case the major children of the deceased husband, Salvador Castelluccio, could not be made parties plaintiff in this court, as forced heirs of their father, unless there had been a judg-

ment in the trial court. In other words, plaintiffs claim that the judgment of the trial court in favor of Salvador Castelluccio vested property in him, and that his major children inherited this property when he died, although the suspensive appeal which had been taken from the trial court was still pending in the appellate court.

In supprt of this claim he cites Article 548 of the Code of Practice and Vincent vs. Sharp, 9 La. Ann. 463, and Chivers vs. Roger, 50 La. Ann. 57, 23 So. 100.

Article 548, C. P., reads as follows:

"A judgment, when once rendered, becomes the property of him in whose favor it has been given; and the judge can not alter the same, except in the mode provided by law."

This article was fully discussed in the case of Cassard vs. Tracy, 52 La. Ann. 836, 27 So. 368, where the facts were as follows:

"While the Constitution of 1879 was still in force plaintiff had obtained judgment in the trial court for less than five hundred dollars ($500.00) and defendant had taken a suspensive appeal to the Court of Appeal. While the appeal was pending the Constitution of 1898, which changed the law as regards hearing of such cases, in the appellate court, went into effect. Under the former constitution appeals from judgments for less than five hundred dollars ($500.00) were upon questions of law alone and the evidence given in the trial court was not taken down in writing. As the Constitution of 1898 provided that all cases on appeal to the Court of Appeal should be tried on the original record pleadings and evidence, appellant moved that the case be remanded to the District Court with instructions that the case be tried anew.

"The Court of Appeal denied the motion to remand, decided the case on the law alone and affirmed the judgment. On a writ of review to the Supreme Court, Justice Monroe in the original opinion held that the judgment was 'property' within the meaning of the Fourteenth Amendment to the U. S. Constitution and affirmed the judgment of the Court of Appeal.

"On rehearing the former judgment was reversed and the case was remanded to the lower court for new trial.

"In the course of his opinion on rehearing Justice Blanchard uses the following language:

" 'The judgments which plaintiffs had recovered in the trial courts were *not final judgments*, no vested rights had yet accrued, no indefeasible title in anything had passed.'

"A suspensive appeal was pending."

Later the case of Bloomfield vs. Thompson, 134 La. 946, 64 So. 853, Justice Monroe in commenting on the above decision used the following words.

"The Chief Justice and the writer of this opinion dissented upon the grounds that the judgment appealed from had become so far as to become the property of plaintiff."

As this ruling has not been modified by any subsequent decision, we must hold that a judgment from a trial court, suspensively appealed from, has not become so far final as to become the property of plaintiff and therefore transmissible by inheritance.

In the case of Vincent vs. Sharp, 9 La. Ann. 463, plaintiff obtained a judgment for one hundred dollars ($100.00) for assault and battery. Defendant appealed and during the pendency of the appeal plaintiff died and the curator of his estate was made party plaintiff. The court in a few lines held a personal action for damages did not expire with the person who instituted it, but made no reference whatever to the fact that judgment had been given in plaintiff's favor below.

The articles of the Code of Practice and the Civil Code cited in the opinion all re-

fer to actions and do not refer to judgments. Furthermore this case was decided in 1854 and since that time Article 2315 has been amended three times and the question of heritability of actions for personal injuries (where there has been no judgment in the trial court) under that article has been definitely settled by the recent decision in the Kerner case quoted above.

In Chivers vs. Roger, 50 La. Ann. 57, 23 So. 100, plaintiff sued for damages for the death of his son, and after the case was tried and argued but before judgment plaintiff died and his heirs were made parties plaintiff. The trial judge then dismissed the suit on the ground that the action abated with the death of the father. The Supreme Court in affirming the judgment quotes approvingly from the Succession of Tugwell, 43 La. Ann. 879, 9 So. 499, as follows:

"A judgment obtained by the widow (for her homestead of 1000) is not any more heritable than the claim itself prior to the possession."

In the course of the opinion although the point was not material to the issue, Judge Watkins uses the following language:

"In Beaird vs. Russ, 34 La. Ann. 315, our predecessors said that 'It is clear that an appeal is a mere incident to an action and not at all the same thing. The judgment is the result or the consequence of the action and the appeal is the mode of seeking to have the judgment of the inferior court corrected.' "

He then goes on to say:
"A judgment is the property of him in whose favor it is rendered. Therefore, it may well be stated that a judgment would pass at the death of one in whose favor it was rendered to his heirs, when an action pending would not, because the right of action had lapsed on account of the demise."

He does say that the judgment would pass and in so saying apparently contradicts the very language quoted above from the Succession of Tugwell.

We consider that this statement is purely obiter, but if it be considered material, it has been overruled by the decision of Justice Blanchard in the case of Cassard vs. Tracy quoted above.

The analogy between this case and the widow's homestead case referred to above is certainly strong, for the evidence shows that Salvador Castelluccio was so infirm and decrepit that he was entirely dependent upon his wife for support, and we infer that the trial judge, though he did not allocate any part of his judgment to the specific claim of loss of support, must have been largely influenced by that consideration in making his award.

Although this identical point is "res nova" in our jurisprudence, we have, after careful consideration, concluded that the basic reason underlying the amendments to Article 2315, C. C., as shown by the history of those amendments and by thorough analysis of all prior decisions on the subject, sustains defendant's contention and we therefore hold that the action of plaintiff perished with his death and his major children could not be made plaintiffs in this cause.

As the minor daughter was seventeen years old when accident happened, and as the evidence shows that she was then earning $9.90 a week and was helping to support her father and mother, we think that an award to her of twenty-five hundred dollars ($2500.00) will be substantial justice.

For above reasons the judgment of the trial court is now amended and it is now ordered, adjudged and decreed that there

be judgment in favor of Lucia Castelluccio against the Cloverland Dairy Products Co., Inc., in the sum of twenty-five hundred dollars ($2500.00) with legal interest from judicial demand.