(43 South. 458.)

No. 16,320.

BRINKMAN v. ST. LANDRY COTTON OIL CO.

(March 18, 1907. Rehearing Denied April 15, 1907.)

MASTER AND SERVANT — INJURY TO MINOR— PROXIMATE CAUSE—DAMAGES.

This suit is one brought by a father for damages for personal injuries received by his minor son through the alleged negligence of the defendant corporation, and for reimbursement for damages to himself arising from the fact of such injury. The trial court held that the fault and imprudence of the boy was the proximate cause of the injury, and rejected both claims. It did not discuss the question of fault and negligence on the part of the defendant. The Supreme Court does not concur in the conclusions reached by the trial judge, deciding after an examination of the evidence that he ascribed to the injured boy a knowledge of the situation and position of the working machinery at the place of the accident and of its method of operation and a familiarity with the surroundings of the place greater than he justly could be presumed to have had, in view of his connection and relations with the mill property. It holds that fault and imprudence of the boy was not the proximate cause of the injury, but for reasons assigned that that cause was fault and negligence on the part of the defendant company. It also holds that the father was entitled to be paid for his own loss of time resulting from the accident and for his expenditures for his son made necessary by the accident, but not for the mental pain and sorrow which he himself suffered on account of the injury to his son.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Damages, §§ 255–259.]

(Syllabus by the Court.)

Appeal from Sixteenth Judicial District Court, Parish of St. Landry; Edward Taylor Lewis, Judge.

Action by Frank Brinkman, for use of his minor son, and individually, against the St. Landry Cotton Oil Company. Judgment for defendant, and plaintiff appeals. Reversed, and judgment rendered.

Robert Lee Garland and Gilbert Louis Dupré, for appellant. Kenneth Baillio and Edward Benjamin Du Buisson, for appellee.

### Statement of the Case.

NICHOLLS, J. The plaintiff, as father of the minor, John Brinkman, claims, for the use and benefit of the said minor, damages to the amount of $7,000 for personal injuries received by his said son through the alleged gross negligence on the part of the defendant, and, in his own behalf, for damages to himself growing out of the said occurrence and the injuries received by his son.

In the petition filed it is averred that during the month of November, 1904, on the 24th day of said month, he brought a wagon load of cotton seed to the town of Opelousas for sale and delivery to the said St. Landry Cotton Seed Oil Company, and that said wagon was driven by his said minor child, John. He avers that, in order to deliver said cotton seed, it was necessary for his said son to drive his aforesaid wagon to the door of the warehouse where said seed is unloaded, and then to unload, or have the same un-

loaded. That his said minor child, in compliance with said duty and the rules of said corporation, drove his wagon to the doorway of said warehouse, and, after awaiting the unloading of another wagon just preceding his, drove his wagon into position preparatory to unloading the same. That, being informed that he must unload his wagon, he stepped into said warehouse to get the seed fork with which seed is usually unloaded and left standing in the seed by the wagoner just preceding him. He stepped on what he supposed to be a pile of cotton seed resting on the flooring of said warehouse, when his left foot was caught by the seed conveyor then in full movement, though hidden from view, injuring and mangling the same to such an extent as to necessitate the amputation, of said leg at the knee joint, causing the loss of said leg.

Petitioner avers that his said minor child was guilty of no negligence, and was unable to ascertain and know that said seed conveyor was open, and that said pile of cotton seed was as quicksand, with lurking danger concealed beneath. That the action of said St. Landry Cotton Seed Oil Company in leaving said conveyor open, when thus concealed from view, with nothing to warn the person having business in said warehouse, where the same is situated or the danger thereof or the fact that the same is open, constitutes gross negligence on the part of said corporation, and renders them liable for the injury sustained by petitioner's aforesaid minor child. Petitioner avers that his own means are limited, and he has been unable to educate his aforesaid son to fit him for any profession, involving upon him manual labor as a means of livelihood. That said injury caused his aforesaid son great pain and suffering and mental anguish. That he was confined to his bed for a period of three months, and is even yet suffering therefrom. That he is entitled to recover for said minor child from said St. Landry Cotton Seed Oil Company the following damages, to wit:

In the petition the damages claimed are set forth in detail.

Defendant, after pleading the general issue, averred that it admitted that the said minor, Brinkman, named in the petition, is the party who was injured and got hurt at the cotton seed warehouse of respondent; but respondent specially denies that said injury was caused in any manner by the fault, neglect, or act of respondent in any manner, and, on the contrary, declares that the said injury occurred and was due solely and entirely to the acts, the fault, the negligence, and the imprudence of the said party injured, and more especially to his want of care and prudence in unduly exposing himself to harm and injury by the machinery in said warehouse, which was fully visible, and by needlessly coming in contact with said machinery.

That the said injured party, without asking for directions from respondent's agent, drove his wagon into said cotton seed warehouse near the conveyor which was then in motion and being operated for the transfer of the seed to its mill, and by jumping from his wagon over said seed conveyor, and across the same, to a slanting pile of cotton seed nearby, for the purpose of getting a fork that was at the top of the said slanting pile of cotton seed, and that his weight and the act of jumping onto the said pile of slanting cotton seed near said conveyor caused the same to slip and give way, and said injured party was thereby carried by said cotton seed in its fall to the conveyor, from which he received the injuries complained of in this suit. And that the said injury was not only due to the acts and fault of said injured party in the premises, but could have been avoided by the exercise of ordinary care and prudence on his part.

The case was tried before the district

judge, and judgment was rendered in favor of the defendant, and plaintiff has appealed.

The district judge gave extended reasons for the judgment which he rendered. In doing so he said:

"The facts are: The defendant operates a large cotten seed oil plant at the town of Opelousas, and in connection therewith has a large seed house for the storing of its seed just north of the mill proper. That a conveyor system is operated in said seed house, which the evidence shows is a necessity to the handling of the large quantity of seed used in the milling operations, and the court is satisfied from the evidence that said conveyor system is not constructed or operated in a manner to endanger the persons or the patrons of the mill, and that it is in fact located at the only place, and operated in the only manner, in which it can prove serviceable in economizing in the handling of its seed. The fact that it has been operated as it was on the day of the accident for the past five or six years, without accident or injury to the hundreds of persons unloading seed through it and near it, save in the one case now at bar, is mute but strong evidence that its construction and use is not dangerous to the person exercising ordinary care and prudence. The conveyor in which the accident occurred is situated on the east side of the wide wagonway running through the seed house, and consists of a large spiral augur inclosed in a box 18x18 inches, at an average level of about two feet six inches above the floor of the driveway. That a line of posts in the driveway on the side of the conveyor box prevents a wagon from coming nearer than about two feet from this box, and that the system of unloading seed at defendant's seed house is for the wagoner entering the seed house to drive as near as he can to the conveyor box, and from his wagon to unload his seed, or have it unloaded by the employés of the mill, at his option, into apertures or holes in the conveyor box, 18x18 inches in size, where it comes into contact with the conveyor augur, and is carried into any part of the seed building at a rapid rate, and as fast or faster than it can be unloaded at the aperture in the conveyor box. Now, under this system, it is unnecessary for the wagoner to leave his wagon, or at least the driveway, even where he exercises the option of unloading his wagon, for which the mill pays 15 cents for an average wagon load. The driveway is entirely safe to the wagoner, and the only danger that he can incur after entering it is by coming into contact with the conveyor in the box at the side of the driveway. That this conveyor is dangerous to a person coming into contact with it at one of the apertures is clearly obvious to the ordinary observer from its size, the rapidity of its revolutions, the whirr and grinding noise clearly audible from the driveway, and by the view of the machinery and driving gear to be seen on entering the driveway at the south end of the seed house. The court has no doubt, besides,

that the location of this conveyor, its operation, and the danger of coming into contact with it, was well known to the injured boy, and was well known to him, as he admitted having during several seasons hauled seed to this seed house, and unloaded his own wagons into the conveyor. He must be presumed, therefore, to have known that it was not safe to attempt to leave the wagon driveway, and to attempt to cross the conveyor while it was in motion; and, while there is some conflict in the testimony as to whether the conveyor box was entirely or only partially covered by the seed to the east of the conveyor box, yet, even conceding it to have been entirely covered, the movement of the driving gear at the entrance of the seed house, the noise made by the conveyor itself, and his previous trips to the seed house must have apprised him that the conveyor was in motion, and that it lay a few feet at most from the outer edge of the driveway and between the driveway and the pile of seed where the fork was, that he says in his testimony he was attempting to reach when the accident occurred.

"Now on the morning of the accident, the elder Brinkman carried two wagon loads of seed to defendant's seed house. The injured boy drove the front wagon, and entered the driveway of the seed house on the right-hand side, but had to wait in the driveway a short while, as a wagon was unloading into the conveyor box on the same side, which was being unloaded by a Mr. Kamy. The Brinkmans, father and son, state that Chachere, the superintendent of the seed house, instructed him, the boy, to move into Kamy's place, when he should have unloaded, and unload in the same place, and the elder Brinkman, towards the close of his testimony adds that he also instructed him to use the same fork that Kamy was using. Chachere denies this statement in toto, but the conflict is, in the opinion of the court, not material or important. After Kamy had unloaded, he threw the fork he had been using on a pile of seed on the further and east side of the conveyor, and the injured boy states that he then drove up his wagon into the place occupied by Kamy, and attempted to cross the conveyor and get the fork on the other side of it, when his foot fell into the conveyor and was badly mangled. The case pivots upon the facts occurring at this time and place, and they have been carefully considered and weighed as all-important. Were any of these acts the acts of the defendant, or induced or authorized by it, or commanded by it? Were they, on the other hand, the purely voluntary acts of the injured party? In the opinion of the court they were the latter's acts, voluntarily done, unnecessarily done, with a knowledge of the risk, and give him no legal ground for an action against the defendant. In the first place, he voluntarily chose to unload his own wagon. Admitting that Chachere instructed him to unload the wagon in the same place that Kamy had unloaded, this did not justify him in attempting to cross the conveyor, which could be seen and heard to be in motion, and which his previous acquaintance with

the surroundings had apprised him to be dangerous, and which this previous experience likewise apprised him, he would have to cross in order to get the fork. Chachere was unaware of his rash attempt to cross the conveyor, for the Brinkmans themselves say that, after giving his instructions, he left the seed house and went to unload some cars on the railroad switch. Now, as Chachere had left the scene before Kamy had unloaded, can he be held accountable for Kamy's throwing the fork into the seed on the farther side of the conveyor or for the younger Brinkman attempting to cross the conveyor to get it, even conceding as true the elder Brinkman's statement that Chachere instructed his son to use this same fork? This contingency was evidently not contemplated by Chachere, even conceding the stated instructions were given; and to hold the defendant liable for the accident would be to stretch those instructions beyond their literal import and meaning, and construe them into a command to the injured party to get the fork, even if he had to cross the conveyor to get it, and this would convict Chachere of criminal wrong and negligence, for he says he had at all times done all he could to warn persons of the danger of these conveyors. On the other hand, the injured boy, who was in his wagon just behind Kamy, could have readily obtained the fork from Kamy by asking for it, and, even after it was thrown across the conveyor, he could have procured one of the employés of the mill, who the evidence shows was working on that side of the conveyor where the fork was thrown and about 30 feet away, to get it for him, or he could have asked and called for another one. He did none of these things, and voluntarily took the risk of crossing the conveyor. The choice on his part was unfortunate and deplorable, but the court knows of no principle of the law of negligence, and has been referred to none, by which the consequences of this act can be legally fastened on the defendant. It is therefore ordered, adjudged, and decreed that the demands of plaintiff be rejected, and his suit dismissed at his costs."

### Opinion.

We attach to this opinion for reference a résumé of what we consider to be the pivotal testimony in this case. It would be of no benefit to the profession to embody it herein. A number of witnesses were examined on both sides, and the testimony was exceedingly contradictory upon some points. The district judge says he did not think it necessary to discuss that testimony, so that the case comes to us free from any conclusions on those points. The point of view from which the judgment of the district court was rendered was that, for reasons assigned, the proximate cause of injury to the boy was his own fault and imprudence. As the result of that conclusion, no discussion of the situation quoad fault or negligence on the part of the defendant was made by the judge. Under the view we take of the testimony, it is necessary that this should be done. In our opinion the trial judge has ascribed to the injured boy a knowledge of the situation and position of the working machinery at the place of the accident and its method of operations; also a familiarity with the surroundings of the place greater than he justly could be presumed to have had, in view of his connection and relations with the mill property. He was not an employé of the defendant, working in and about the mill, but a farm boy sent occasionally by his father to the mill to unload and deliver from the cart he was driving cotton seed which his father had sold to it. Under such circumstances, he would have no special concern in the mill, and not likely either to make inquiries regarding it, or to notice conditions there. His father, who had gone more frequently than his son had done to the mill for the same purpose, had derived no knowledge of the same from his trips, and it was very natural that neither should have done so. The spiral conveyor was hidden from view, inclosed in a wooden boxing, and no one could form any opinion, without actually seeing it, how it was worked, or where it was placed. The fact that openings might be seen in the boxing would not convey to the mind of a person unfamiliar with machinery that there was a spiral conveyor inside of the boxing and opposite the hole which would make it dangerous to insert one's foot into the boxing. The noise of the machinery might inform persons entering the said room that there was machinery at work, but it would not indicate to them the danger points connected with the same. The first testimony which we turn our atten-

tion to is at the threshold of the case. It is whether or not the boy and his brother drove their carts into the seed house without any conversation with the manager of the building—whether the boy stopped for the purpose of unloading at a point which he himself had selected, and whether of his own motion he left his wagon imprudently in order to obtain a seed fork which some workman preceding him had left standing in the pile of seed, to the right of it and just across from the boxing of the conveyor. Chachere, the superintendent of the seed room, testified that he did not see the father of the injured boy, or either of his two sons, until after the accident, and that he gave no directions or instructions whatever to any of them. The three Brinkmans testified directly to the contrary and as to the direction he gave to the boy. That they were at the seed house prior to and at the time of the accident is not disputed. H. Chachere testifies that it was his duty and custom to meet the wagons as they were driven to the gate of the seed house, receive from the drivers tickets giving the weights of the seed, and place his initials upon the face of the same. He declared that it was his custom, when the drivers of the cart intended to unload their own carts, to place his initials on the back of the tickets, so as to indicate that fact and authorize payment to the drivers of remuneration for this particular service. The Brinkman tickets bore the initials of Chachere on their face, but not on their back. He maintains that his signature as it appears on the tickets was made after the accident, but his answers to questions on that subject as to who handed him the tickets, who gave them to him, and when and where he signed them, are exceedingly unsatisfactory. The fact that the tickets did not have the initials of Chachere on the back is not conclusive. It was testified to that the father was a regular customer of the mill, that he had open account with it, and that his wagons were "habitually unloaded by himself," so that there was no particular necessity for noting that fact on the back of the tickets. Chachere says that at the time of the accident he was at the railroad track engaged with some hands in unloading a car load of seed. That was not his proper place at the time; but, if special circumstances required his presence at the front, he should have left some one to replace him. The Brinkmans say that, after Chachere had given directions to the boy, he went to the front of the seed house. The driver of the wagon just ahead of the boy, and who was replaced by the wagon of the latter, testified that he had been given instructions that day by Chachere. We scarcely think it likely that the boy would have driven his wagon into the building without directions, and stopped where he did of his own motion. The testimony of Chachere stands uncorroborated in the record, and guided, as we must be, by the preponderance of evidence, we must and do hold that the boy had received instructions from Chachere, which the Brinkmans testified to. A lengthy discussion was made at the bar as to whether the boy was directed for the purpose of unloading to get the seed fork of the driver who had preceded him, or whether he gave him any directions whatever on that subject. The testimony of the Brinkmans on that point is uncontradicted, except as it is contradicted by the general denial of Chachere that he gave him any directions whatever. Kamy, the driver of the cart ahead of that of the Brinkman boy, testified that the fork which he had belonged to himself, and he had taken it off with him; that the fork standing in the seed pile had been left by some one else. We do not think it a matter of any importance whether the boy was directed to get the fork from Kamy or not. He was directed to get a fork, and the necessity of the situation required that he should get one from some quarter. When Kamy drove off, there

was a fork which no one was using, and that fact invited the boy to appropriate it to his own use, if he could do so without imprudence. It is claimed by the defendant that the boy should not have left his seat in the wagon, that he should have remained in the wagon until Chachere came back; but it could not be expected that he should remain on the wagon until Chachere returned. The latter had received all necessary directions. It is claimed that the boy was imprudent in getting out of this cart, but we do not think he was. There was no sign of danger in his doing as he did. He saw to his right a pile of seed which he had no reason to think would precipitate him if he stepped upon it into a hole in a box at the bottom of which was running machinery. We think that it was established that the conveyor boxing was covered with a pile of seed at the time, that it could not be seen, and that the boy had no reason to suppose that the machinery was at work at the particular point at which he had stopped. We think the boy could, without any charge of imprudence, step down on the seed, as he did, to reach for the fork. We do not think he saw the hole and attempted to jump across it. It is claimed that it was impossible for the hole to have been concealed from view when the conveyor was at work, as the seed would be carried away as fast as it was thrown into or over the hole; that, at all events, there would be signs of moving seed over the hole, which necessarily warned the boy of the presence of the hole below. It was testified to on the trial that these holes in the boxing could be clogged if there was a sufficient quantity of seed over them and this without stopping the running of the conveyor. Chachere testified that the conveyor would carry off at once all the seed above the hole and keep it in view, but he added that this would be so if the seed was thrown over a single fork. We have no reason to suppose that the seed over the boxing had been thrown over the boxing by the use of the single fork. On the contrary, we think it was caused by the sliding down upon it of the seed from the high pile of seed to the right of it; there having been no planking or other precaution taken to prevent it from sliding. We think the defendant should have had some person present where the boy stopped to caution and warn him of danger. Chachere, or some one else, should have been at the spot as matters stood on that morning. There was nothing on the spot to indicate or to prevent danger. We think the ruling of the court as to the admissibility, under plaintiff's pleadings, of testimony to prove that fact, and allowing such testimony, was correct. We think that defendant was guilty of negligence in the premises, and that the boy should recover damages for his injury. We think the father was also entitled to be reimbursed for the different amounts he was shown to have expended, such as physicians' bills, board, etc., but is not entitled to any damage for the mental pain and suffering which he and his wife underwent by reason of the injury to the son. Thompson on Negligence, vol. 2, p. 1260.

For the reasons herein assigned, it is hereby ordered, adjudged, and decreed that the judgment of the district court be and the same is hereby annulled, avoided, and reversed, and it is now ordered, adjudged, and decreed that the plaintiff, for the use of and on behalf of his minor son, John Brinkman, do have and recover judgment for the sum of $4,000, with legal interest thereon from the date of the judgment herein, against the defendant, the St. Landry Cotton Oil Company, until paid.

It is further ordered, adjudged, and decreed that the plaintiff do have and recover judgment for himself against the defendant, the St. Landry Cotton Oil Company, for the sum of $235, with legal interest from the date of this judgment until paid. It is further decreed that defendant pay the costs of both courts.