[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 496 
This suit was brought by Egbert E. Davies and Sue Shroeter Davies, father and mother of Billie Sue Davies, to recover damages and expenses resulting from injuries received by the daughter when she was run over by an automobile driven by Welby Stahl and owned by P.J. Mabry.
The sole defendant is Consolidated Underwriters, the insurer of the car, neither the owner nor the driver being a party to the suit.
We think at this time to fix the chronology of the various events and actions in order that in disposing of the questions presented for determination, we might make our findings clear:
The accident, which is the basis of plaintiffs' claim, occurred on July 1, 1938; petition on behalf of Egbert E. Davies, individually, and for the use and benefit of his minor child, Billie Sue Davies, the victim of the accident, and for Sue Shroeter Davies, the mother of the injured child, was filed in the District Court of Caddo Parish against Consolidated Underwriters as defendant, on March 15, 1939, and citation was served through the Secretary of State on March 16, 1939; by judgment filed October 21, 1939, the demands of plaintiffs were rejected; appeal was properly taken to the Court of Appeal, Second Circuit; on February 6, 1940, the child, Billie Sue Davies, died; on May 10, 1940, counsel for plaintiffs filed in this court an alternative motion to remand; on November 29, 1940, this court rendered judgment affirming the judgment of the lower court; rehearing was applied for and granted; on January 28, 1941, an independent suit was filed by Egbert E. Davies and Sue Shroeter Davies against Welby Stahl, and by amendment filed February 1, 1941, the Consolidated Underwriters were made party; on June 18, 1941, this court, on rehearing, reinstated and made final its original decree 6 So.2d 347; on July 18, 1941, writ of certiorari was issued to this court by the Honorable The Supreme Court of the State of Louisiana; on January 5, 1942, The Supreme Court rendered judgment annulling the judgments of this court and the District Court, and remanding the case to the District Court"for the purpose of permitting plaintiffs to amend their petitionin line with the allegations of their motion to remand and for further proceedings consistent with the views herein expressed" (emphasis ours) 199 La. 459, 6 So.2d 351, 357; on February 18, 1942, amended petition was filed in this suit by Egbert E. Davies and Sue Shroeter Davies praying for judgment for damages against the defendant for the death of their daughter; on February 18, 1942, amended petition was filed in the suit of Egbert E. Davies and wife against Welby Stahl et al., praying that the demands asserted in said suit as against the Consolidated Underwriters be withdrawn "so that they may be heard and determined in Cause No. 76,400 as therein alleged", allowance of which petition was objected to by defendant; on February 24, 1942, the court ordered Suit No. 81,625 dismissed as to the defendant, Consolidated Underwriters; there was judgment in favor of the plaintiffs signed October 31, 1942; the matter is now before this court on appeal from said judgment.
Defendant filed the following exceptions and pleas:
1. Prescription of thirty days and twelve months;
2. Motion to strike allegations in the amended petition inconsistent with the original petition;
3. Waiver and estoppel;
4. Jurisdiction of the District Court under the mandate of the Supreme Court; and
5. Exceptions of no cause and no right of action.
The organ of the court on the plea of prescription is Judge Hardy and his opinion is as follows: *Page 497 
Defendant has filed pleas of prescription of thirty days and one year, which have been strenuously urged by counsel in argument and briefs.
We feel that the plea of prescription of thirty days, which period is provided in the policy of insurance, is unworthy of consideration, because of the fact that the enforcement of such a contractual provision would have the effect of divesting injured parties of a right granted by law through the operation of the independent provision of a contract to which they were not parties.
Proceeding to a consideration of the plea of prescription of one year, it is observed that defendant's counsel contends that the period of one year set forth in Article 2315 of the Civil Code is in effect a period of peremption. Whether or not this is correct we do not consider that the designation of the period as a period of prescription or peremption materially affects the determination of the plea.
The prescription which is urged in this case may be defined as that rule of law which raises an absolute bar to the prosecution of a cause of action. Considered in this light, it is evident that the purpose of the prescriptive provision of Article 2315 is designed to relieve and release those who may be charged with the commission of a tort from the fear of litigation as the result of offending actions or liabilities. Accordingly, the provision is essentially a requirement of notice formally given by the institution of a suit, a notice that will inform a defendant of the action for damages that is brought against him.
Counsel for defendant has repeatedly urged that the action for injury originally brought, and the action for death later attempted to be made a part of the proceedings, constitute two separate and distinct causes of action. With this conclusion we are unable to agree. The cause of action which resulted from the injury to the child, and subsequently from the death of the child, is the same, being a proceeding in tort under the provisions of Article 2315 of the Civil Code. We infer from arguments advanced in support of the contention that the objection likely is aimed not at the cause of action but at the right of action, which, with regard to injury, belonged to the child or her legal representative, and upon death was vested in the surviving parents of the child. Since the parents of the child were already before the court in their individual as well as representative capacities, we cannot comprehend how the death of the child might materially change the situation that existed either as to the capacities of the parties plaintiff or the cause of action involved, save and except with reference to the nature and quantum of damages, being the distinction between damages for injury and damages for death.
Our courts have been increasingly liberal in application of the doctrine of prescription as a bar to action and a release from liability in connection with tort actions. The development of our jurisprudence has pointed to a disregard of the fatalities of minor technicalities in favor of a broad and liberal construction that would protect the fundamental rights of parties litigant rather than enforce fine distinctions and technicalities with reference to the method and manner of proceeding. The courts have recognized that justice is armed with the broad sword rather than the fencing foil, and thereby is enabled to cleave to the root of every case, undeterred by superficial interference rising from unimportant provisions. As was well said by Justice Higgins in the opinion in Reeves v. Globe Indemnity Company, 185 La. 42,168 So. 488, 491:
"This conclusion is not only in accord with the weight of authority, but consonant with constructions of equity and the modern trend of liberality in upholding substantive rights instead of subtle technicalities."
The above case to which we refer is, of course, the outstanding authority in support of the principle of permitting amendments, and in that case the court laid down the principle that a petition which was sufficient to apprise the insurer of the nature of the demand made was sufficient to interrupt the applicable one-year prescription, even though the allegations of the cause of action against the insurer were defective.
We feel that the case before this court is much stronger in favor of the plaintiffs than the Reeves case, because of the fact that the original petition was not lacking in necessary allegations and therefore there was no need for its amendment insofar as either the cause of action or the capacities of the parties were concerned.
Great stress has been laid upon the fact that shortly before the running of the *Page 498 
prescriptive period these plaintiffs instituted a separate and independent action against Stahl, the driver of the car which was responsible for the accident, later amending the petition to include the insurer, the defendant in this case; that this action was subsequently dismissed and the claim for damages resulting from the death of the child transferred to this suit by amendment. From these facts it is argued on behalf of defendant that plaintiffs recognized the insufficiency of this action by instituting a separate suit and subsequently abandoned such separate suit, which action resulted in the accrual of prescription. We cannot subscribe to this view. Indeed, we are impressed with the fact that plaintiffs have consistently attempted to protect their rights, even against all technical objections that might have been asserted, by proceeding, not alone in one but in several ways, to assert and re-assert those rights.
It is impossible to consider the jurisprudence of our State and fail to be impressed by the fact that our courts have consciously sought to permit amendments so long as no material damage is sustained by the defendant. While it is true that the law does not favor amendments, it is equally true that the law is slow to deny its right and forever bar a plaintiff from the assertion of a just claim. Accordingly, it has been held that where a defendant is sued in a representative capacity and later sued in his individual capacity on the same cause of action, the first suit has been held to interrupt prescription, Vernon v. Illinois Central Railroad Company, 154 La. 370, 97 So. 493; where there has been improper service on the defendant it has been held that prescription was nonetheless interrupted, Anding v. Texas P. Railway Company, 158 La. 412, 104 So. 190. Likewise it has been held that prescription was interrupted even where citation was invalid because of technical errors in preparation or service. Similarly, where petitions have failed to state causes of action our courts have held that prescription has been interrupted, and in some cases, even after the exception has been sustained, amendment has been permitted.
An analysis of the clear trend of jurisprudence on this point confirms us in the conclusion that the essential element is that the proper defendant be judicially notified of the rights which are sought and of the plaintiff's intent to proceed with action. This element being present there is a legal interruption of prescription. We thoroughly approve of this interpretation and we are absolutely convinced that the instant case presents facts which entitle the plaintiff to the utmost consideration in the application of this principle.
Let us look at the facts. A mother and father bring suit against the insurer of an alleged negligent driver who has caused injury to their little daughter. The cause of action is found in the tort of the driver of the car, and the insurer is proceeded against by the parents, claiming damages individually and for the use and benefit of the minor child. The case is tried, decided against the plaintiffs, and appealed. While on appeal the child dies and there is timely filed in the Court of Appeal a motion to remand. True, this was not an unqualified motion, and the reason is obvious. Plaintiffs had lost the case in the lower Court. If, and only if, the defendant should be held liable by a higher court would the motion to remand be necessary. Plaintiffs did not request the performance of a futile act, nor did they make a useless request, and counsel for plaintiffs denominated the pleading an "alternative motion to remand". The appellation we find as comprehensive and appropriate as any they might have selected. As a matter of fact, this court affirmed the judgment of the lower Court and plaintiffs then applied for a writ of certiorari to the Supreme Court. The decision of the Supreme Court reversing the judgment of this court and the District Court became final on February 3, 1942. From the opinion of Justice Rogers the following is quoted:
"For the reasons assigned the judgments of the Court of Appeal and of the district court are annulled and the case is remanded to the district court for the purpose of permitting plaintiffs to amend their petition in line with the allegations of their motion to remand and for further proceedings consistent with the views herein expressed."
While it is true that no court can take notice of the running of prescription, and that a specific plea of prescription must be before the court, nevertheless, we are quite clear that the Supreme Court in that portion of the opinion above quoted recognized not only the presence but the efficacy of the alternative motion to remand which had been filed on behalf of plaintiffs. *Page 499 
However, plaintiffs did not entirely rely upon the effect of this motion, but continued by other methods to assert their rights, and to this end filed an independent suit, which suit was only dismissed as to defendant with full reservation of plaintiffs' rights after the amended petition had been filed in this case.
However, as we have concluded, the principal question involved in consideration of prescription turns upon notice to the defendant. We cannot conceive of any injury to the defendant, or any lessening of its rights, or of any lack of protection that has come to pass as a result of these proceedings. Certainly the defendant has known from the date of the original filing of this suit that it must defend itself against a claim for damages arising out of a particular accident in connection with which it was or could have become thoroughly familiar with all facts. There has never been any change in plaintiffs' position; there has never been any change in plaintiffs, and the only element constituting a change in the entire course of this litigation has been that, whereas the injured child lived at the time of institution of the suit, it has since died. We cannot conceive how defendant can claim that its rights have been prejudiced through any technical failure to follow some course of procedure other than that pursued by plaintiffs in the instant case. The cause of action remains the same; the parties in whom is vested the right of action are now and have been before the court in their individual capacities since the institution of this suit.
For the reasons assigned, we are of the opinion that the pleas of prescription were properly overruled.
The motions to strike Paragraphs 3, 4, 5 and 6 from the amended petition cannot be sustained for the reason such a motion has no place in our pleading and practice. Stanley v. Jones,197 La. 627, 2 So.2d 45; State ex rel. Sutton et al. v. Caldwell et al.,195 La. 507, 197 So. 214; Perez v. Meraux, 195 La. 987,197 So. 683; Babst v. Hartz et al., 161 La. 427, 108 So. 871; Central Savings Bank Trust Company v. Oil Field Supply Scrap Material Company, La.App., 12 So.2d 815; Id., 202 La. 787, 12 So.2d 819; Atchley v. Horne, 13 So.2d 75, rendered this day by us.
Defendant contends that all rights under the motion to remand filed in this court when the case was formerly before us have been waived and the plaintiffs are estopped to urge herein matters contained in said motion to remand by instituting a separate suit for damages for the death of their daughter.
The new suit was voluntarily dismissed by the plaintiffs and was not pursued to judgment. Such voluntary dismissal prior to trial has the same effect as if it had never been filed. If plaintiffs had continued with the new suit and suffered judgment to be rendered against them and then attempted to continue with the amended petition in the case at bar, the plea would undoubtedly be good, but since the new suit was dismissed voluntarily by plaintiffs before trial, they have neither waived nor are they estopped from proceeding under the amended petition.
Defendant relies on the case of Liles v. Texas Company,166 La. 293, 294, 117 So. 229. It is not in point, for the reason plaintiffs filed a suit in tort and prosecuted it to final judgment and then attempted to recover that part of his claim which was rejected in the first suit in a second suit which was an action quasi ex contractu. The Court held the cause of action in both suits was the same and sustained a plea of res judicata.
Defendant contends that the District Court was without jurisdiction to try the case for the reason the Supreme Court was without power or authority to confer jurisdiction on the District Court when its jurisdiction had been divested by an appeal, not to the Supreme Court, but to the Court of Appeal. Its contention is that the Supreme Court should have remanded the case to the Court of Appeal with instructions and the Court of Appeal should have remanded it to the District Court with similar instructions.
The Supreme Court disposed of that question as is reported in199 La. 459, 6 So.2d 351, 357, as follows:
"While this case was pending in the Court of Appeal, plaintiffs' injured child died and plaintiffs filed in the Court of Appeal an alternative motion to remand the case in which they alleged that the death of their child was directly traceable to the automobile accident in which she was injured. In their motion, plaintiffs prayed `that if the Court should find liability in the defendant that this case be remanded to the lower court for the amendment of the petition in accordance with the facts herein *Page 500 
recited, and for the taking of further testimony on the question of the quantum of damages.'
"Since the Court of Appeal, in affirming the judgment of the district court, found that no liability attached to defendant under the terms of the policy, there was no necessity for the Court to pass upon the motion to remand. Neither the district court nor the Court of Appeal passed on the facts of the case.
"For the reasons assigned, the judgments of the Court of Appeal and of the district court are annulled, and the case is remanded to the district court for the purpose of permitting plaintiffs to amend their petition in line with the allegations of their motion to remand and for further proceedings consistent with the views herein expressed; defendant to pay the costs of appeal and of the proceeding in this Court, all other costs to await the final disposition of the case."
We feel sure the Supreme Court carefully considered the question of its power and authority in the premises before remanding the case to the District Court, which Court disposed of this issue as follows:
"Defendant cites Article 860 of the Code of Practice referring to mandates, which reads:
"`This mandate can only be directed to an inferior judge by the court having immediate appellate jurisdiction over him, and by no other.'
and that by Article VII, Sec. 10 of the Constitution, the Court of Appeal has immediate appellate jurisdiction over district courts in suits for damages for physical injuries such as involved in this case, hence the Supreme Court was without right or authority to remand the case directly to the District Court, but should have sent it back to the Court of Appeal with instructions.
"The codal Article referred to was adopted in 1870, when it appears that the Supreme Court had only appellate jurisdiction. However, the matter is covered by Section 11 of Article VII of the Constitution, which provides in part:
"`It shall be competent for the Supreme Court to require by writ of certiorari, or otherwise, any case to be certified from the Courts of Appeal to it for review, with the same power and authority in the case as if it had been carried directly byappeal to said court.'
"Section 10 of Article VII:
"`The Supreme Court shall have control of, and general supervision over all inferior courts.'
"Therefore, under these two articles of the Constitution the Supreme Court, having called up the case under the writ of certiorari, had the power to dispose of it the same as if it had been carried directly to the Supreme Court from the District Court. Furthermore, if the Supreme Court had the right to send the case back to the Court of Appeal and require it to remand same to the District Court; and then to require the District Court to permit an amended petition to be filed, there seems to be no good reason why the Supreme Court could not under its supervisory powers direct the District Court directly what should be done, instead of directing the Court of Appeal to direct the District Court what should be done in the premises. We find no merit in the plea and it was properly overruled."
The case of Bloomfield v. Thompson, 134 La. 923, 64 So. 853, cited by defendant, is not authority for its contention. It only holds that the Supreme Court is without authority to hear a case on a writ of certiorari from the District Court when the law provides for an appeal to the Court of Appeal. The plea to the jurisdiction was correctly overruled.
The exceptions of no cause and no right of action are based upon the theory that since P.J. Mabry, the owner of the automobile, was admittedly not liable to plaintiffs, his insurer was not liable. This question has been foreclosed by the decision of the Supreme Court in this same case, cited supra.
We can hardly believe defendant is serious in its last contention on which the exceptions are based, which is that it was the duty of plaintiffs to cooperate in the defense of the case, its contention being that although plaintiffs are suing to recover judgment against the insurer, they are bound by the policy to assist the insurer in defeating their claim. Defendant evidently is confused as to who is the insured. The insured, under the policy in this case, is the driver of the car and not the plaintiffs. There is no merit to the exceptions and they were properly overruled. *Page 501 
 On the Merits.
We have carefully studied all the testimony in the case and have concluded that the lower court has correctly determined the issues in a well written opinion, which is as follows:
"The Supreme Court has already held that the policy of insurance herein sued on covered Welby Stahl, the driver of the automobile, and the question now arises — was the accident and injury to Billie Sue Davies the result of the negligence of Welby Stahl?
"The testimony of Welby Stahl is that he drove along Missouri Avenue and turned left into Stonewall Street and was proceeding West, driving at between 15 and 20 miles per hour (and much faster according to the evidence of other witnesses). The speed limit fixed by City Ordinance is 18 miles per hour in that territory (which we think he exceeded). Welby Stahl says that he saw a number of persons, including Mrs. Davies, on his left as he started up Stonewall Street; that he heard an outcry and looked to his left to learn the cause of the outcry; that it sounded like a man's voice, and that he immediately applied the brake on the automobile; that he never did see Billie Sue Davies until she was struck by his automobile, and that his automobile was stopped within four or five feet after striking the child; that due to the child's height and her sudden appearance from behind automobiles parked on his right, he could not see her over the front of his automobile.
"Mrs. Baggett, for defendant, says that she heard the automobile coming rapidly down the street, but did not see the accident; and her testimony, like some of plaintiffs' witnesses, can hardly be relied on due to the fact that they were not looking and due to the excitement at the time.
"Mr. Davies came out of his front room and saw his daughter entering the street and at that time noted Welby Stahl approaching, at which time Stahl was opposite Davies' west property line.
"Mr. Varble, whose testimony was taken out of court, testifies that he was sitting on the Baggett porch on the North side of the street and observed the child coming into the street, at which time Welby Stahl was 50 feet away.
"Defendant had Mr. Dutton, a civil engineer, to make measurements of the street, and other data, being assisted by Welby Stahl, who furnished the information or data from which Mr. Dutton measured and marked the points of interest, from which it is shown that the West line of plaintiffs' property is 120 feet from Missouri Avenue; then it is 35 feet to the point where the automobile skidmarks began to appear, and then 16 feet to where the child was struck; then the automobile went four or five feet farther.
"The pleadings allege, admitted by defendant, that the child before the impact had traversed two-thirds of the street and was struck by the left front light of the automobile. The plat shows the street to be 24.4 feet between curbs at the point of the accident. The evidence shows that automobiles were parked on both sides of the street next to the curbs; that shrubbery of good size was growing along the sidewalk on plaintiffs' side of the street.
"The main question is whether Billie Sue Davies suddenly ran out into the street in such close proximity to the automobile that Stahl could not see her or stop his automobile in time to prevent the accident, if so, there is no negligence on his part; but if Welby Stahl was not keeping a proper lookout under the circumstances of the case and was a sufficient distance away to have stopped the automobile before striking the child, even though he did not in fact see her, if he could have seen her, then he was negligent and the defendant would be liable.
"There was filed in evidence a table showing the distance an automobile will travel at various rates of speed, and distance in which an automobile can be stopped, etc.
"We think that from the testimony of Stahl, and the table of distances, plus his map of the ground, shows that Stahl was negligent. As he turned into Stonewall Street he saw the group of ladies in front of the Baggett house; he recognized Mrs. Davies; he does not say where he was when he heard the outcry, but we assume that he would have said it was at the point of the West line of plaintiffs' property, as that is where he makes the first indication on the map filed in evidence showing the scene of the accident; that when he heard the scream he thought it was from his left and looked in that direction, *Page 502 
and he travelled 35 feet before his car began to skid and skidded 18 feet, and then he struck the child and moved four or five feet further; hence, this would show that he travelled 59 feet from the time he heard the outcry until his car came to a stop after the child was struck. Mr. Davies testifies that when the child was four or five feet into the street, Stahl was 60 feet away. Mr. Varble estimated the distance at 50 feet.
"The table of distances states that a person driving 20 miles per hour travels 22 feet per second; that it takes three-fourths of a second to react to a warning before the brake is actually applied, and that `total distance required to stop is 40 feet at 20 miles per hour (and we must assume that these are minimum figures, based on good brakes, etc.), and the fact that Stahl first directed his attention to the cause of the outcry, we are quite sure his first reaction was not directed to the application of his brakes.
"Assuming that Billie Sue Davies, thirty months of age, was traveling at the rate of three miles or a little greater, she traversed some nine feet of the open street, then turned either into the car or down the street away from the car and Stahl was traveling at least six times as fast, hence must have travelled six times as far as Billie Sue travelled, which also shows 50 feet or more.
"It is the duty of the driver of an automobile to keep a strict lookout ahead of him, especially in a much frequented place (as he knew this to be) and there appears no good legal reason why he could not have seen Billie Sue Davies when he was at least 50 feet away and should have been able to stop without striking her. Hence, we are bound to hold that he was negligent in the matter, which negligence is the proximate cause of the accident.
"A child of thirty months of age cannot be guilty of contributory negligence, and the mere fact that a parent permitted their child to enter a street is not, in our opinion, contributory negligence sufficient to bar recovery, as the entry into the street was not the proximate cause of the injury. The child may have remained in the street for hours without injury to herself, but when an automobile comes along and the driver sees, or should have seen the person, and drives over such person without stopping, the act of the driver is the proximate cause of the accident. We are of the opinion that [had] Stahl began to stop when he heard the outcry, he could easily have seen the child and could have stopped before striking her, but instead of beginning to stop, he first directed his attention toward his left to ascertain the cause of the alarm and after a lapse of a second or such matter, it was too late to avoid the accident.
 "Quantum of Damages.
"The evidence shows that Billie Sue Davies was struck in the right side by the automobile, knocked through the air a short distance and rolled several feet along the street, picked up, rushed to the hospital in the car driven by Welby Stahl. The evidence shows that the child had brush burns almost all over the entire body; that she had a cut under one eye, but x-rays failed to reveal any broken bones or fractures, and she was removed to her home that same night, and her parents instructed to give her particular attention; to note her reaction to the accident.
"It appears that on July 4th at 6:00 P.M., the child was returned to the hospital with a temperature of 100.3; her trouble diagnosed as paralytic ileus; that she was very ill for a period of ten days during which time she remained at the hospital; that due to her fretfulness, she was again removed to her home and for more than two weeks, her fever ran as high as 104 degrees, and continued for several weeks, maybe two or three months; that she could not retain food in the stomach; that when she ate she would swell, and if she was active after eating, she would vomit; that she favored her right side; that she did not have a normal bowel movement; that blood was discharged from the rectum; that when she became constipated she had convulsions, which were relieved by artificial evacuation of the bowels; and these conditions prevailed until her fatal illness when a like condition existed and artificial means did not relieve her, and she died on February 5, 1940.
"Following the death an autopsy was performed by Dr. Willis Butler, Coroner of Caddo Parish, which autopsy revealed that the omentum (the blanket covering the internal organs) had moved to the right side and attached to the liver, colon and appendix. The peritoneum was engorged and showed a peritonitis in all *Page 503 
stages from chronic to sub-acute and acute; the liver was enlarged, showing the imprint of the ribs; kidneys enlarged, etc.
"`The anatomical diagnoses were: Peritonitis with purulent fluid; nepthritis; liver changes, fatty and metabolic.'
"`The cause of death: Peritonitis with nephritis and liver changes, possibly following old trauma, (automobile).'
"The medical history should be considered in two phases: first, the amount of injury to the child during the first three days after the accident; secondly, the amount of suffering from July 4, 1938, to the date of death; this for the reason that if the illness of July 4, 1938, was not a result of the accident, then plaintiffs could only recover for the pain and suffering of the first three days; then, if the child's condition from July 4th to February 5, 1940, was a result of the accident, plaintiffs would be entitled to recover for that suffering; then we have to consider whether the child's death was a result of the automobile accident; if so, plaintiffs would be entitled to recover for the death of the child as set out in their amended petition.
"The medical testimony, so far as we are concerned, is more confusing than enlightening, due to our lack of medical training, and any comment on same might be far afield from a true interpretation of same, but we reach our conclusions in this way: There is no doubt from the evidence that Billie Sue Davies was a normal child until the day of the accident; that she received a severe blow in the right side; that from that time on she suffered from an ileus; that trauma could cause such a condition; and that she died from that condition; that the history and treatment as testified to by Drs. Dickson and Worley, who treated the child, and the autopsy performed by Dr. Butler prove these facts with sufficient certainty to our mind to hold for the plaintiffs throughout.
"There is some testimony to the effect that Billie Sue Davies was possibly suffering from gonorrhea, causing a vaginal discharge which caused a burning sensation upon urination. Dr. Wolfe, for defendant at the trial in June, 1939, stated that he had examined the child `recently' (date not given) and that he had a slide taken and the laboratory technician reported that he found pus-cells — gonorrhea germs. However, Dr. Wolfe did not go so far as to say that the child was suffering from gonorrhea or that the germ was causing the discharge; he said that the presence of the germ could explain to him `some of the symptoms which the mother accounted to me the child was suffering from'. Dr. Wolfe went on to explain that the fact that there was a gonorrhea germ present did not mean that the child had received it by sexual contact, but that children pick up the germ from soiled clothing; that every child that is brought to the hospital is examined for it; that it was known that a great many times a child had entered the hospital suffering from some other disease and affected with a gonorrhea germ `and every female child in the ward gets it. It spreads through like measles'. Dr. Webb assisted in that examination and testifies to the presence of the germ. Plaintiffs' doctors thereafter made several tests and the germ was not found. We have to conclude that Dr. Wolfe did find the germ, but he did not testify that it had been present an hour or weeks, or that it caused the disability from which Billie Sue Davies was suffering.
"Dr. Webb, for defendant, testified that he saw Billie Sue Davies four or five times during the first year of her life, for the purpose of regulating her diet; that he saw her several times with Dr. Lucas, his partner, during the second year of her life — at no place did he testify that there was any physical abnormality or that she suffered any disease of the body which might have resulted in the condition causing her death.
"The evidence on the last trial as to the cause of death was given for plaintiffs by Drs. Worley, who had treated the child throughout, and Dr. Butler, who made the autopsy, with the assistance of Dr. Worley. We think their testimony and conclusions are plain and that they were in a better position to know the facts and give their conclusions than the other physicians.
"Dr. W.R. Matthews, a leading pathologist of this City, testified for the defendant to the effect that taking the autopsy report made by Dr. Butler, he could not testify that the trauma of July 1, 1938 caused the conditions revealed by the autopsy, particularly the peritonitis from which the child died. This is true, because the autopsy report does not go into the history of the child's condition or statement with reference to the automobile *Page 504 
accident. Dr. Butler was reporting what he saw before him and his opinion as to the cause of death. Dr. Matthews does admit that it was possible to have all the stages of peritonitis as a manifestation of a single progressive infection or process (it having been suggested that peritonitis is either cured or it kills); and the line of questioning by defendant was to the effect that while whatever condition may have immediately resulted from the accident, the child was discharged from the hospital on July 15, 1938 as `cured', which was shown by the hospital record, and when this assumption was placed before the witnesses on the first and second trial, naturally they would testify that the death of the child was not the result of the trauma. If she was `cured' then the result of the accident had passed and whatever condition may have later developed was not the result of the accident; but since we think the evidence clearly shows that the child was not `cured' on July 15th, then the testimony of these witnesses with reference to the causal connection between the accident and the death of the child becomes negative.
"Plaintiffs in the original action claimed $750.00 each as damages for mental anguish by reason of the injuries to their child. It is well established in this State that one person cannot recover damages for mental suffering as a result of injuries to the person of another. Seligman v. Holladay, [La. App.], 154 So. 481.
"Plaintiff, Egbert E. Davies, is entitled to recover the medical and burial expenses in the sum of $527.50.
"Had Billie Sue Davies recovered from the injuries received by her as of the date of her death, she would have been entitled to damages for her pain and suffering and which we fix at $1500.00. Her right of action for said sum has survived in favor of her parents, the plaintiffs in this case.
"We think that plaintiffs are entitled to recover the sum of $5000.00 for the loss of their child, and we award them that amount. The aforesaid sums of $1500.00 and $5,000.00 to be divided equally between the plaintiffs.
"The fees of the medical experts who testified in this case are hereby fixed at $25.00.
"For the reasons assigned, plaintiffs are entitled to judgment in accordance with the views expressed herein."
After the opinion was rendered, the court's attention was called to the fact that the policy of insurance issued by defendant was for only $5,000. The court therefore signed a judgment for plaintiffs in the sum of $5,000, dividing it as follows:
In favor of Egbert E. Davies ........................ $2,763.75 In favor of Mrs. Sue Shroeter Davies ................ $2,236.25
together with legal interest from judicial demand until paid and for all costs. It also fixed the fees of the medical expert witnesses at $25 each and taxed same as costs.
The judgment of the lower court is correct and is therefore affirmed, with costs. *Page 580