GLADNEY, Judge.
This is an action by the plaintiff, James A. Michaud, as father and administrator of the estate of his minor child, Rene Michaud, instituted for the purpose of recovering medical expenses and damages for personal injuries sustained as a result of the child being struck by an automobile. Made defendants are Clarence Hood and the Travelers Indemnity Company, the liability insurer of Clarence Hood. After a trial on the merits judgment was rendered in favor of plaintiff for medical expenses of $125 'and in favor of the father for the use and benefit of the minor child, for $2,500. The defendants have suspensively appealed from the judgment so rendered and plaintiffs have filed an answer to the *457 appeal asking that the award in damages be increased.
The accident occurred on August 1, 1954, about 4:00 o’clock P.M. on Louisiana Highway No. 167 in a residential section of Jonesboro, Louisiana, when the automobile owned by Clarence Hood and driven by his eighteen year old daughter, Patricia Hood, struck Rene Michaud as he was crossing the highway in front of his father’s residence. Patricia Hood, who prior to the trial was married to Peyton Spear, was, at the time aforesaid, driving with the consent and permission of her father, Clarence Hood, a 1954 Ford automobile in a northerly direction and was traveling within her proper lane, — that is to say, the west lane of the highway.
The information gleaned from the record as hereinafter depicted is significant. At the place where the accident occurred the highway, which is surfaced with an eighteen foot slab of concrete, runs approximately north and south and is flat and level for a distance of some five hundred to six hundred feet in either direction. The day was bright with good visibility and the pavement was dry. There were no other vehicles parked along either side of the highway nor approaching the scene of the accident at the time above mentioned, nor were there any pedestrians or children on the highway, other than Rene Michaud.
The Michaud residence is situated on the west side of the highway and on the opposite or the east side there is an open lot. Immediately in front of the Michaud home and fifteen feet from the edge of the concrete slab there is an evergreen bush from three to four feet in height with diameter of from twelve to eighteen feet. Just south of this evergreen there is a Crepe Myrtle bush close to the highway right-of-way. A short distance south of the Michaud residence there was a sign reading: “Begin 35 Mile Speed Limit” and approximately one hundred yards north of the point of the accident was a similar sign reading: “Begin 25 Mile Speed Limit”. In between these two signs located on the west side of the highway there was a third sign: "Watch For Children”.
A short interval before the accident Mr:-Michaud had entered the lot on the east side of the street in order to obtain a better view of a jet plane which was overhead at the time. Rene Michaud, the six year old son of plaintiff, and Carolyn Michaud, his fifteen year old sister, were standing in plaintiff’s front yard also watching the plane. Michaud called to his son to join him. It was while going to join his father that Rene was hit by the approaching automobile.
Mr. Michaud and Mrs. Spear were the only eyewitnesses who testified upon the trial. A third eyewitness died before his testimony could be taken. John Henry Barnes, a deputy sheriff, Adrian Peevy, marshal of the Town of Jonesboro, and Clarence Hood, father of Patricia Hood, all gave evidence as to their observations at the scene of the accident. Michaud testified that after observing the highway to be clear of traffic he called to Rene to come over, watched him start off walking, and then diverted his attention to the jet plane. Some seconds later he heard the noise of brakes being applied and tires skidding and looked in time to see the automobile about to strike the boy. The child appeared to be walking and was looking up; and he thought the motor vehicle was traveling about fifty miles per hour. The child was about half way across the west half of the concrete slab when struck and directly in front of the Michaud residence. The body of the boy moved from sixty to seventy feet before coming to rest and the car proceeded from fifty to seventy feet after the impact. The child, unconscious, was taken in the Hood automobile to a hospital.
Carolyn Michaud testified that when her father called Rene she and Rene were in the front yard watching the jet plane and that Rene turned and walked away from her to *458 the edge of the evergreen bush and she did not see him again until after the accident, as she- was also watching the plane.
Mrs. Spear was alone in the automobile at the time of the accident. She testified that she had cut her speed about half and thought she was traveling from twenty-five to thirty miles per hour when the accident happened. She admitted that her calculation as to speed was an estimate as she was not looking at the speedometer, but watching' the highway ahead of her. Her testimony does not clearly indicate her position when she first noticed the child nor does she say where the child was when she first observed him. Pertinent excerpts of her testimony follow:
“A. Well, he just ran out in front of me — he just ran out in front of me.
******
“Q. And you don’t recall having looked up or off, or anything just before the accident? A. No, I. don’t.
“Q. How close do you say you were to the little boy when you applied your brakes? A. It all happened so suddenly — I stepped on the brakes as quick as I could, then I hit him.
******
“Q. Several hundred yards before you got to the Michaud home, about what speed were you going? A. I ' don’t know. I cut my speed about half way, I guess about 25 or 30 miles — I ■ don’t know exactly.
“Q. When you got just a few feet before the Michauds’ home, could you estimate the speed you were traveling? A. Well, no. -I don’t know exactly how fast — I guess about 25 to 30 miles — I was watching where I was going.
“Q. Now, as you were approaching from the south going north, what were you doing, where were your eyes focused — what were you looking at? A. I was watching the highway in front of me.”
******
“Q. And you said you were looking ahead where you were driving the car? A. Yes, sir.
“Q. Now, Mrs. Spear, what happened when this child appeared — when did you see the child in front of you? A. Well, he just ran out in front of me when I got in the front of their house.
******
“Q. So, do you believe he was on the north side, or the opposite side of the shrub from you? A. Yes, I do.
******
“A. He just ran out in front of me.
“Q. And when he ran out in front of you, what did you do? A. Well, I hit the brakes and I tried to stop, tried to keep from hitting him, but there wasn’t anything I could do, he just ran out in front of me.
****’**
“A. I very definitely could not have avoided it.”
Additional evidence relating particularly to the skid marks or tire prints upon the pavement was furnished by John Henry Barnes, a deputy sheriff, and Adrian Peevy, town marshal of Jonesboro, who went to the1 scene of the accident shortly after it occurred. The substance of their testimony is that the marks were a distance of seventy-five feet in length, which distance was measured by pacing. The skid marks began south of the evergreen bush above referred to, and extended equidistant north and south of the bush. Peevy was of the opinion the car had skidded approximately thirty-seven feet before it struck the child and continued to skid about thirty-eight feet before it came to rest. Clarence Hood, the father of Mrs. Spear, went to the *459 scene of the accident on the following day. He observed two sets of skid marks directly in front of the shrubbery in question, one set of which was approximately twenty-one feet in length, and the other about seventy-five feet. There was no evidence to warrant any inference the' longer tire marks were made by a vehicle other than the Hood car.
From a thoughtful analysis of the evidence, three legal issues are presented for our determination:
Was the speed of the vehicle other than reasonable and proper under the circumstances? Was Mrs. Spear properly observant of the road ahead of her? and, Does the last clear chance doctrine have application ?
The ordinance of the Town of Jonesboro fixing speed limits within the municipality (if any) was not offered in evidence and consequently we have no1 proof thereof. In Haynes v. Fluitt, 1951, La.App., 54 So.2d 844, this court pointed out that signs indicative of a warning as to speed limits cannot be accepted as legal evidence of an established limit. The pertinent law, we find, is LSA-R.S. 32:227, which prohibits the operation of any vehicle upon the highways of this state at other than a reasonable and- proper speed under the circumstances, or at a speed endangering the persons or property of others.
If Mrs. Spear, as she approached the Michaud residence, was indeed traveling at a speed of from twenty-five to thirty miles per hour, we would be forced to the conclusion her speed was reasonable and proper, but the evidence shows her speed was considerably in excess of her estimate, and nearer to, if not more than, forty-five miles per hour. We find this to be true because the net braking distance of the Ford car as reflected by its skid marks or tire imprints upon the pavement, was seventy-five feet, which distance establishes a speed of forty-five miles per hour or more, according to the table or chart accompanying the article “Mechanics of Control and Lookout in Automobile Law” by H. B. Barrett, 14 T.L.R. 503, a recognized authority. According to said chart at a forty-five mile per hour speed, the vehicle was traveling at a velocity of sixty-eight feet per second, and under excellent conditions, required, including reaction time, slightly more than one hundred twenty-five feet to be brought to a stop. These factors indicate Mrs. Spear observed Rene Michaud when the automobile was approximately eighty-five feet from the place of impact. ’It was then, we think, the driver realized the peril and began to assume control of the car.
But, was the assumed speed of forty-five miles per hour unreasonable as to the locality where the accident occurred? We think so. The "'uncontradicted evidence -in the record is that MÍrs. Spear'had been a lifelong resident of Jonesboro and1 the driver of an automobile for about four years. The warning signs, above referred to, were shown to have been in place two or three years,- which should have been noticed by her, and further, thé numerous residences in the vicinity should have caused her to anticipate and to have been on the lookout for the sudden appearance of children. Certainly highway warning signs, whether dr not placed in obedience to ordinance or11 statute, ’ imply to a carefu.1' motorist a known danger or a reasonable rate of speed. The signs which confronted1 or were known to Mrs. Spear, warned of children and cautioned a speed limit of not in excess of thirty-five miles per hour. We find, therefore; that a speed in excess of thirty-five miles per hour in the locality where the accident occurred was unreasonable and improper and violative of LSA-R.S. 32:227.
The evidence is not convincing that Mrs. Spear was not maintaining a proper lookout. As above demonstrated, she observed the child from a distance of eighty-five feet. She insists she was carefully *460 observing the highway, and the record does not prove otherwise.
Nor do we believe that the driver in this instance had an opportunity to avoid striking the child after the peril was or should ¡have been recognized.
The trial court allowed proven medical expenses of $125 and the finding on this point is amply proven by the evidence. Counsel for appellant earnestly contend that the award of $2,500 for personal injuries is excessive and should be reduced to a sum approximating $500. Many authorities are cited by counsel for both sides to show that the award was either, inadequate or excessive. None of these appears to have involved an award based on personal injuries substantially analogous to the case under consideration. In the assessment of such damages the courts are allowed a large measure of discretion.
The child undoubtedly sustained a severe blow and was knocked a distance of approximately sixty feet or more. He sustained severe bruises and a brain concussion, which kept him in the hospital for five days, and thereafter he was confined to his home until the first week in September, when he entered the First Grade of his school. While recuperating Rene developed some irregularity in his gait apparently paused by injured muscles in the thoracic region. His mother testified he suffered from headaches for six or eight months. Dr. Faheam Cannon, orthopedic specialist, examined the child on November 16, 1954 and July 28, 1955. He gave his opinion that as of the latter date the patient had recovered completely from the effects of his injury, and there was no reason to fed that there would be any delayed ill effects from the trauma in question.
Counsel for appellee has answered the appeal and earnestly insists the damages should be increased. It is stressed that the child was unconscious over a period of forty-eight hours immediately following the accident and during this period the attending physician was uncertain as to whether the child would live. We do not think that this fact should be given serious weight in its relation to the pain and suffering of the child. Certainly there was a great deal of anxiety felt by the parents during this dangerous and uncertain period, but recovery therefor by the parents is not allowed under our jurisprudence. See: Hughes v. Gill, 1949, La.App., 41 So.2d 536; Alston v. Cooley, 1927, 5 La.App. 623; Davies v. Consolidated Underwriters, 1943, La.App., 14 So.2d 494; Seligman v. Holladay, 1934, La.App., 154 So. 481, and Brinkman v. St. Landry Cotton Oil Company, 1907, 118 La. 835, 43 So. 458.
The evidence fails to record any great amount of suffering endured by the child. It is certainly most fortunate that no permanent injuries were sustained. For these reasons we are of the opinion that the award for personal injuries is excessive and should be reduced to the sum of $1,000, thus making the total judgment as amended $1,125.
And as so amended, the judgment from which appealed is affirmed, appellee to pay costs of appeal.-
HARDY, J., concurs in the result, .